903 P.2d 752

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Juan C.S. AGUNDIS, Defendant–Appellant.**

No. 20827.

Court of Appeals of Idaho.

Oct. 4, 1995.

Jonathan B. Hull, Kootenai County Public Defender, Coeur D'Alene, for appellant.

Alan G. Lance, Attorney General; Michael A. Henderson, Deputy Attorney General, Boise, for respondent. Michael A. Henderson argued.

LANSING, Judge.

Juan C.S. Agundis appeals from his convictions for one count of trafficking in marijuana, I.C. § 37–2732B(a)(1), one count of trafficking in cocaine, I.C. § 37–2732B(a)(2), and two counts of possession of controlled substances without a drug tax stamp, I.C. §§ 63–4204 through 63–4207. Agundis asserts as error the district court's denial of his motion to suppress evidence and the admission of alleged hearsay at trial relating to the

identification of Agundis as the perpetrator of the criminal acts.[1]

The following facts are drawn from evidence presented on Agundis's motion to suppress evidence. In December 1992, Dan Thornton, a senior special agent with the Idaho Bureau of Narcotics, was at Gittel's Market, a grocery store in Coeur d'Alene. He was not in uniform. As Thornton was walking to his unmarked vehicle, he passed by two men standing at the open hatchback of an automobile located in the parking space adjacent to Thornton's own vehicle. As Thornton passed, one of the men stuffed a white plastic grocery bag underneath his sweater and turned away from Thornton. The men appeared surprised and nervous. Thornton got into his car, drove a short distance away, stopped, and continued to observe the men through his rear-view mirror. The men were handling a number of items including the white plastic bag, a large brown paper grocery bag and a black rectangular object which Thornton thought to be a portable stereo. One of the men picked up the black object and sat down in the passenger seat of the car. When he emerged, the black object was no longer in sight. While these activities were taking place, the men kept glancing at Thornton's vehicle, aware that it had not left the area. Eventually, one of the men closed the hatchback and again concealed the white bag underneath his coat. The other man took the brown bag out of the rear of the car and picked up a shovel that had been leaning against the car. The men then began to walk away down an alley.

Thornton decided to investigate. He drove up to the men, showed his badge and said, "I'm a police officer. I'd like to talk to you. Would you wait right there." One of the men responded, "No," and they continued to walk away, though at a faster pace. Thornton then said, "I'm a police officer. Stop right where you are." The men then began to run. Thornton followed in his car and radioed the local police department for assistance. At a street intersection, the men split up and ran in opposite directions. Thornton left his vehicle at the intersection, pursued one of the men on foot and, after a short chase, tackled and detained that suspect. This man was later identified as David Lopez.

As he conducted a "pat down" of Lopez, Thornton noticed that Lopez no longer possessed the white bag that he had concealed under his coat. Thornton returned to his car with Lopez in tow, handcuffed Lopez, and placed him in the car. Thornton gave a description of the second man to an officer of the Coeur d'Alene police department who had arrived on the scene. Thornton then searched the immediate area and recovered the white plastic bag, the brown paper bag, and the shovel, all of which had been abandoned in the chase. Thornton observed that both of the grocery bags contained what appeared to be marijuana.

Thornton then received a radio message that someone fitting the description of the second fleeing man was being detained in the parking lot of a nearby Albertson's supermarket. Thornton drove to that location with Lopez still in his car. The person there detained was Juan Agundis, the appellant herein. Agundis was arrested shortly thereafter.

The next day, a private citizen found a black bag buried in the snow next to his driveway in the area where the chase had occurred. The citizen looked in the bag and observed that it contained a quantity of a "white powder substance." The citizen called the police. Laboratory analysis identified the substance in the black bag to be cocaine; the substances in the white bag and brown bag were found to be marijuana.

Agundis was charged with trafficking in marijuana, I.C. § 37–2732B(a)(1), trafficking in cocaine, I.C. § 37–2732B(a)(2), and two counts of possession of controlled substances without a drug tax stamp, I.C. §§ 63–4204

---

1. In his brief, Agundis also challenged the constitutionality of the mandatory minimum sentence provisions of Idaho's drug trafficking statute, I.C. § 37–2732B. Subsequent to the filing of this appeal, the Idaho Supreme Court held that Section 37–2732B, as in effect at the time of the offense at issue here, was unconstitutional. *See State v. Sarabia,* 125 Idaho 815, 816–17, 875 P.2d 227, 228–29 (1994). Pursuant to the holding in *Sarabia,* the Supreme Court remanded this case for resentencing. Agundis has been resentenced, and this issue is therefore moot.

through 63–4207. Agundis filed a pretrial motion to suppress evidence of the marijuana and cocaine on the ground that this evidence was obtained through an unlawful seizure of Agundis. This motion was denied upon the district court's conclusion that Agundis had not been seized by police before he abandoned the drugs. Agundis proceeded to trial and was found guilty of all four of the charged offenses. Agundis now appeals, contending the district court erroneously denied his motion to suppress and erroneously overruled his objections to hearsay evidence presented by the State at Agundis's trial. Agundis also asserts that prosecutorial misconduct occurred which necessitates a new trial.

## I.

### MOTION TO SUPPRESS

Agundis maintains that evidence of the cocaine and marijuana should have been suppressed because this evidence was obtained through a seizure of his person [2] that violated the federal and state constitutions. Agundis contends that agent Thornton's statement, "I'm a police officer. Stop right where you are," constituted a seizure within the meaning of the Fourth Amendment to the United States Constitution and Art. I, § 17 of the Idaho Constitution because a reasonable person in Agundis's position would have felt restrained and not free to leave. Agundis further argues that the officer did not have a reasonable articulable suspicion that criminal activity was afoot, as is required for such a detention, and the seizure was therefore illegal. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). According to Agundis, the drugs which were abandoned during the flight from Thornton, were fruit of this alleged illegal police action and consequently must be excluded. See *State v. Rawlings*, 121 Idaho 930, 932, 829 P.2d 520, 522 (1992).

We are thus called upon to determine whether Agundis was "seized" in violation of the Fourth Amendment to the United States Constitution or Art. I, § 17 of the Idaho Constitution when the officer directed him to stop.

■ The salient facts in this case are not in dispute; only their legal significance is at issue. Therefore, we exercise free review of the trial court's legal conclusion that a seizure did not occur. *State v. Weber*, 116 Idaho 449, 451–52, 776 P.2d 458, 460–61 (1989); *State v. Pick*, 124 Idaho 601, 604, 861 P.2d 1266, 1269 (Ct.App.1993).

### A. Fourth Amendment

The Fourth Amendment to the United States Constitution guarantees freedom from "unreasonable searches and seizures." Its application in this case is governed by the United States Supreme Court decision in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In that case, the defendant fled on foot at the sight of a unmarked police car, and the police undertook pursuit. During the ensuing chase, and before being tackled by a police officer, the defendant discarded crack cocaine. The defendant asserted that the officer's pursuit constituted an illegal seizure and that the defendant's abandonment of the cocaine was excludable as the fruit of that seizure. The United States Supreme Court rejected this contention. The Court accepted the defendant's proposition that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," and assumed, for purposes of its analysis, that the officer's pursuit of Hodari qualified as a "show of authority" that called upon Hodari to stop. *Id.* at 625, 111 S.Ct. at 1550. The Court held, however, that a mere show of authority, where the subject does not submit, will not constitute a seizure within the meaning of the Fourth Amendment. The Court concluded that a seizure implicating Fourth Amendment protections, like a common law arrest, requires application of physical force

---

**2.** Without expressly admitting that he was the second person viewed by Thornton with Lopez at Gittel's Market, Agundis moved to suppress evidence found by the police as a result of that encounter. For ease of reference, but without intent to express any view on the identity issue, in addressing the suppression motion we refer to the second man as "Agundis," as did Agundis in his briefing to this Court.

by an officer or, in the absence of force, submission by the suspect to an officer's assertion of authority. *Id.* at 626, 111 S.Ct. at 1550–51.

*Hodari D.* is factually distinguishable from the instant case only in that Hodari ran before the police officers uttered a word, whereas Agundis was ordered to stop. This distinction is of no legal significance, however, under the Supreme Court's analysis. Indeed, in *Hodari D.* the Court stated:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.

*Id.* at 626, 111 S.Ct. at 1550.

■ There is no contention that Agent Thornton touched Agundis before the drugs were discarded or that Agundis submitted to the officer's show of authority when Thornton ordered him to stop. Instead, Agundis continued to walk—and then to run—away from the officer. It is thus an inescapable conclusion that, under the governing authority of *Hodari D.*, no Fourth Amendment seizure of Agundis occurred prior to the abandonment of the marijuana and cocaine that were later found by the police. The district court therefore did not err in denying Agundis's motion to suppress the drugs on a theory that this evidence was the fruit of a seizure proscribed by the Fourth Amendment.

Because there was no Fourth Amendment seizure, we need not reach the question whether the conduct observed by Agent Thornton created a reasonable suspicion of criminal activity that would justify a seizure.

## B. Article I, § 17 of the Idaho Constitution.

Article I, § 17 of the Idaho Constitution, in language nearly identical to the Fourth

Amendment, prohibits unreasonable seizures by the state.[3] Agundis asks this Court to reject the *Hodari D.* analysis in interpreting our state constitution. He argues that the Idaho Constitution should be found to provide broader protection in this circumstance than that afforded by its federal counterpart. Agundis relies upon the oft-stated maxim that "a person has been 'seized,' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). This proposition, articulated in *Mendenhall* and developed further in *Mendenhall's* progeny, including *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) and *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), has frequently been cited by the Idaho appellate courts. *See State v. Bainbridge,* 117 Idaho 245, 247–48, 787 P.2d 231, 233–34 (1990) (seizure challenged under both Fourth Amendment and Art. I, § 17 of the Idaho Constitution); *State v. Jordan,* 122 Idaho 771, 772 n. 2, 839 P.2d 38, 39 n. 2 (Ct.App.1992) (applying Fourth Amendment only); *State v. Zubizareta,* 122 Idaho 823, 826–27, 839 P.2d 1237, 1240–41 (Ct.App.1992) (same); *State v. Fry,* 122 Idaho 100, 102–03, 831 P.2d 942, 944–45 (Ct.App.1991) (same); *State v. Osborne,* 121 Idaho 520, 523–24, 826 P.2d 481, 484–85 (Ct. App.1991) (same). Because of the Idaho courts' frequent reliance on the *Mendenhall* formulation, Agundis contends that it correctly states the standard for a seizure under the Idaho Constitution. He maintains that a reasonable person when confronted by a law enforcement officer saying, "Stop right where you are," would not feel free to leave and that a seizure under the Idaho Constitution was therefore effectuated.

■ The question here presented—whether a person who does not yield to a police command to stop, but instead flees, has been

3. Art. I, § 17 of the Idaho Constitution states: The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.

"seized" within the meaning of Art. I, § 17 of the Idaho Constitution—is a question not previously addressed by the appellate courts of this State.[4] In interpreting Art. I, § 17, we are not bound by the United States Supreme Court's interpretations of the Fourth Amendment. *State v. Thompson*, 114 Idaho 746, 760 P.2d 1162 (1988); *State v. Newman*, 108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985). Indeed, the Idaho Supreme Court has twice held that this state's constitutional proscription of unreasonable searches and seizures affords broader protection than that granted under United States Supreme Court decisions interpreting the Fourth Amendment. *See State v. Guzman*, 122 Idaho 981, 987–998, 842 P.2d 660, 666–677 (1992) (holding that the good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is inapplicable under Art. I, § 17); *State v. Thompson, supra* (holding that use of a pen register is a search under Art. I, § 17 though use of such device was held not to be a Fourth Amendment search in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). Therefore, the United States Supreme Court's decision in *Hodari D.* does not dictate a similar result under our state constitution.

Nonetheless, in interpreting the terms of Art. I, § 17, we are in agreement with the United States Supreme Court's holding that a mere show of authority by a police officer which is unheeded by the suspect does not amount to a seizure. The argument advanced by Agundis, based upon the formulation of *Mendenhall* that a seizure occurs "only if ... a reasonable person would have felt that he was not free to leave," falls short of its mark. We agree with the United

States Supreme Court's response to the same argument in *Hodari D.*:

> In seeking to rely upon [the *Mendenhall* test] here, respondent fails to read it carefully. It says that a person has been seized "only if," not that he has been seized "whenever"; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a "show of authority."

*Hodari D.*, 499 U.S. at 628, 111 S.Ct. at 1551 (emphasis in original). The import of *Mendenhall* was to establish that the test for a "show of authority" is an objective one based upon how a reasonable person would have understood the officer's words and actions, not a subjective standard turning upon the individual defendant's perception as to whether his freedom of action was restricted. *Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877–78. *See also Hodari D.*, 499 U.S. at 628, 111 S.Ct. at 1551–52; *Chesternut*, 486 U.S. at 574, 108 S.Ct. at 1979–80. Further, *Mendenhall* required more than a determination that a reasonable person would not have felt free to leave. The Supreme Court stated that: "[W]e adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *Mendenhall*, 446 U.S. at 553, 100 S.Ct. at 1877. Neither *Mendenhall* nor any Idaho decisions revealed by our research have held that a person who disregarded a law enforcement officer's show of force was nonetheless "seized" because a reasonable person would have submitted to the officer's commands. Accordingly, we do not view the holding in *Hodari D.* to be inconsistent with *Mendenhall* or with existing Idaho law.

---

**4.** Although *Hodari D.* has been cited in three opinions by the appellate courts of this State, it has never been adopted in interpreting the Idaho Constitution. In *State v. Rawlings*, 121 Idaho 930, 829 P.2d 520 (1992), our Supreme Court, addressing a claim that both the Fourth Amendment and Art. I, § 17 had been violated by police conduct, cited *Hodari D.*, but in *Rawlings* it was undisputed that the defendant had been seized, and the only issues were whether the seizure and the associated search were reasonable. *Hodari D.* was also cited in two Court of Appeals decisions, *In re Mackey*, 124 Idaho 585, 586–87, 861

P.2d 1250, 1251–52 (Ct.App.1993) and *State v. Fry*, 122 Idaho 100, 102–03, 831 P.2d 942, 944–45 (Ct.App.1991). In *Fry*, however, only application of the Fourth Amendment was at issue. In *Mackey*, although the appellant relied upon both the federal and state constitutions to challenge his alleged seizure, he made no argument that greater protection was afforded under the state constitution. Moreover, in *Mackey*, the appellant was not even aware of the officer's "show of force" before he backed his vehicle into a patrol car.

We are mindful that deterrence of unlawful conduct by law enforcement authorities is an important consideration in interpreting Art. I, § 17 of the Idaho Constitution. *See Guzman,* 122 Idaho 981, 842 P.2d 660 (1992). It may be argued that police will not be dissuaded from unjustified efforts to detain citizens if we allow into evidence contraband that was abandoned by a suspect who flees following an unlawful command to stop. Again, however, we find ourselves in agreement with the United States Supreme Court's conclusion that no added deterrence value would be obtained by excluding evidence in the circumstances presented here:

> Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.

*Hodari D.,* 499 U.S. at 627, 111 S.Ct. at 1551.[5]

We hold, accordingly, that in the absence of application of physical force, a person who does not submit to law enforcement authority is not seized within the meaning of Art. I, § 17 of the Idaho Constitution. When Agundis fled from Agent Thornton, there was no "seizure" in the common and ordinary sense, and it is our holding today that there was no seizure in a constitutional sense.

## II.

### EVIDENTIARY ISSUES

#### A. Documents

The man who was chased and apprehended by Agent Thornton, David Lopez, pleaded guilty to drug-related charges. Agundis, unlike Lopez, was not immediately apprehended by Agent Thornton but was stopped some ten or fifteen minutes later and several blocks away by another police officer acting upon Thornton's description of the second fleeing suspect. Agundis pleaded not guilty and proceeded to a jury trial. The defense strategy at Agundis's trial was to call into question whether Agundis was actually the second man who had fled from Agent Thornton and had apparently discarded the brown bag of marijuana and black bundle of cocaine as he ran. In order to establish Agundis's identity as that person, the prosecution placed into evidence a number of documents which linked Agundis to Lopez. These exhibits showed that Lopez and Agundis had used the same or similar addresses. Agundis objected to two of these exhibits as hearsay, but his objections were overruled. On appeal Agundis claims error in the admission of this evidence.

The first of these challenged exhibits was the pre-booking sheet completed at the time of Agundis's arrest. It listed Agundis's address as "828 S. 5th" in Pasco, Washington. Agent Thornton testified that he personally filled out the document using the address given by Agundis. The second exhibit consisted of Western Union records of two money transfers sent by Joseph Pennazoli, a resident of Coeur d'Alene, to David Lopez in Pasco, Washington. These Western Union records included copies of the checks to Lopez for the transferred sums. On the back of each check there appeared Lopez's signature of endorsement and a handwritten street address, "828 S. 5th Ave. AP # C." Thus, taken together, these exhibits suggested that Agundis and Lopez had each claimed the address of 828 S. 5th in Pasco, Washington.

Agundis objected to the address information in these documents as hearsay.

---

5. Although we here agree with several aspects of the United States Supreme Court's analysis in *Hodari D.,* our decision today should not be viewed as a wholesale adoption, for purposes of interpreting our state constitution, of all statements of the majority opinion in *Hodari D.* We imply neither agreement nor disagreement with dicta in that opinion regarding hypothetical circumstances that are not presented here.

The district court found the exhibits admissible under the business records exception to the hearsay rule, I.R.E. 803(6). We, however, find it unnecessary to consider the applicability of that hearsay exception, for we conclude that the address information on the documents was not hearsay. We thus apply the principle that where the trial court's decision is correct but entered on a different theory, it will be affirmed on the correct theory. *State v. Werneth,* 101 Idaho 241, 243, 611 P.2d 1026, 1028 (1980), *cert. denied,* 449 U.S. 1129, 101 S.Ct. 951, 67 L.Ed.2d 118 (1981).

■ "Hearsay" as that term is used in the Idaho Rules of Evidence, does not encompass all out-of-court-statements, but only those which are offered in evidence "to prove the truth of the matter asserted." I.R.E. 801(c); *State v. Scroggie,* 110 Idaho 103, 112, 714 P.2d 72, 81 (Ct.App.1986). The record before us shows that the primary issue, if not the sole issue at Agundis's trial, was whether Agundis was the man who had been seen by Agent Thornton with Lopez and who had run north away from Thornton. To help persuade the jury that Agundis was that person, the prosecutor presented various types of evidence linking Agundis to Lopez. It is apparent that the prosecutor was not offering the challenged exhibits for the truth of the addresses stated thereon. Whether Lopez or Agundis actually lived at the address stated on the exhibits was immaterial. What was significant was merely the fact that both Agundis and Lopez had used or claimed the same address, a fact which allows an inference that Agundis and Lopez were associates. It made no difference to the State's case whether Agundis or Lopez had ever lived at the Pasco address or whether a residence even exists at "828 S. 5th" in Pasco, Washington. Indeed, the inference of an association between Agundis and Lopez might be strongest if the address were fictional. The use of the common address was circumstantial evidence of a link between the two men, and this link was probative in determining whether Agundis was the second man observed by Agent Thornton. When used in this way, as circumstantial evidence of Agundis's association with Lopez, and not to prove that Agundis or Lopez had ever

been at "828 S. 5th," the evidence was not hearsay. *See United States v. Mazyak,* 650 F.2d 788, 792 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982) (letter addressed to all four defendants by name and referring to a boat, offered for purpose of linking the defendants with one another and to the vessel, was not hearsay); *United States v. Canieso,* 470 F.2d 1224, 1232 (2d Cir.1972) (letter found in codefendant's wallet, which was similar to letter found on defendant, was not hearsay when offered not as proof of statements therein but only as circumstantial evidence that the two defendants were linked). *Cf. United States v. Patrick,* 959 F.2d 991 (D.C.Cir.1992) (defendant's name and a street address on sales receipt was hearsay where used to establish that defendant resided at that address). Because the exhibits in question were offered for a nonhearsay purpose, the district court did not err in overruling Agundis's hearsay objection.

**B. Conversation between Thornton and Lopez**

■ Agundis next contends that a new trial is necessary due to prosecutorial misconduct. He asserts that the prosecutor improperly elicited hearsay regarding a conversation between Agent Thornton and Lopez after the trial court had sustained Agundis's objections to the questioning. The evidence at issue related to a conversation that occurred when Thornton drove with Lopez, who was then under arrest, to the Albertson's parking lot where Agundis was being detained by another police officer. Thornton testified that when he arrived at the scene he observed that the person being held appeared to be the same person he had seen with Lopez about fifteen minutes earlier. As the prosecutor continued the direct examination of Agent Thornton, the following exchange occurred:

Q. As you approached the defendant near Albertson's, what was going on in your automobile?

A. At that point I was speaking with David Lopez and asked him to identify anyone standing there.

DEFENSE COUNSEL: I would object, your Honor, move to strike any conversation as hearsay.

THE COURT: I'm not so sure I heard any conversation being related yet. Maybe I missed something there. I'm going to overrule the objection at this point.

PROSECUTOR: During the course of his objection, Judge, and overhearing the interpreter, I didn't hear his answer. Could we have that?

THE COURT: You asked him basically, as I recall, what he was doing. And where I left off he said he was talking to David Lopez.

DEFENSE COUNSEL: Your Honor, I'd object to this line of questioning and request that the jury be excused so that I can voice my objection.

THE COURT: Well, I'm not so sure there is anything before the Court right now to object to. If you could help me out a little bit here. He hasn't asked him, that I heard, for anything that would be hearsay, call for a hearsay response. Maybe he intends to. So far I haven't heard that.

. . . .

Q.   (By Prosecutor) Did you ask Mr. Lopez any specific questions while he was in your car as you approached the defendant?

A.   Yes.

DEFENSE COUNSEL: I would object on the relevance, your Honor.

THE COURT: I think I'll sustain it on that ground.

. . . .

Q.   (By Prosecutor) What was going on in your car as you approached the defendant who was detained by Don Brown at that point?

A.   I was speaking with David Lopez and asked him to—

DEFENSE COUNSEL: I would object to what he asked him as irrelevant.

THE COURT: Overrule the objection as far as it went.

A.   Asked him to identify anyone standing at the police car.

DEFENSE COUNSEL: I'd object, move to strike on relevance ground.

THE COURT: I think we're just flirting right on a knife edge here. I'm going to sustain that objection as to the last part of the answer. Motion to strike is granted. I'll instruct the jury to disregard it.

The prosecutor then asked to present argument, and the jury was excused. The prosecutor argued that Thornton's testimony about having asked Lopez whether Lopez could identify Agundis was relevant because "it goes to identification." The prosecutor averred that he was not eliciting hearsay because he was not asking Agent Thornton to relay Lopez's answer to the question. The district court responded to this argument by pointing out that Thornton's question to Lopez would be relevant "only if you ask the next question which would call for a hearsay response." The court then reiterated its ruling sustaining the defendant's objection to the prosecutor's line of inquiry.

The jury was returned to the courtroom, and the direct examination of Agent Thornton resumed. The prosecutor's next question to Thornton was, "After your conversation in the automobile what did you do next?" A portion of Thornton's response was, "I exited my car, pointed over to Officer Brown toward the defendant, and told Officer Brown, that's him." Later, during cross-examination, Thornton acknowledged that, based solely upon his own observations at Gittel's Market, he could not positively identify Agundis as the second man, but he was "eighty percent" sure.

At the conclusion of Thornton's testimony, Agundis moved for a mistrial based in part upon the prosecutor's again alluding to the conversation between Thornton and Lopez after the court had sustained Agundis's objection and had ordered that testimony regarding the conversation be stricken. The trial court denied the motion for a mistrial.

On appeal, Agundis asserts that the prosecutor's question directing the jury's attention to the conversation, followed by Thornton's testimony that, upon the conclusion of that conversation, he told Officer Brown, "That's him," conveyed to the jury that Lopez had identified Agundis as his companion. Agundis contends that this was impermissible hearsay presented by the prosecutor in direct violation of the trial court's order sustaining Agundis's objection to that line of inquiry. According to Agundis, this amounted to prosecutorial misconduct that prejudiced the defense.

In order to address Agundis's contention of prosecutorial misconduct, we must examine the testimony the prosecutor was attempting to elicit. We agree with Agundis that Thornton's testimony that he asked Lopez to "identify anyone standing there," followed by Thornton's further testimony that he immediately thereafter told another officer, "That's him," implies that Lopez had identified Agundis in response to Thornton's question. The prosecutor's purpose for the testimony, as admitted during his argument on Agundis's objection, was to convey this identification to the jury by implication.

■ Such testimony, which conveys the substance of an out-of-court statement for the truth of the matter asserted, is properly characterized as hearsay even though the statement is not directly repeated. In *State v. Gomez*, 126 Idaho 700, 889 P.2d 729 (Ct. App.1994), we explained:

> The hearsay rule not only prohibits repetition of the actual out-of-court statement; it also applies where the witness attempts to convey the substance or purport of the statement. Therefore, a hearsay objection may not be avoided merely by having the witness give a summary of the conversation or convey the purport of the information received rather than relating the details of the statement. If the purpose of such testimony is to prove the truth of facts asserted in the out-of-court statement, the proffered testimony is hearsay. *Id.*, 126 Idaho at 704, 889 P.2d at 733 (citations omitted).

Here, the prosecutor was attempting to introduce hearsay by conveying the substance of Lopez's answer to Thornton's question without directly relating the answer itself. As the Texas Court of Criminal Appeals observed in *Schaffer v. State*, 777 S.W.2d 111, 114 (Tex.Crim.App.1989), "[W]here there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly." Therefore, the district court was correct in ultimately sustaining Agundis's objections to the prosecutor's line of inquiry.[6]

Agundis complains, however, not about the trial court's ruling on his objections but about the prosecutor's conduct after Agundis's objection was sustained. He maintains that by again asking a question referencing the conversation between Thornton and Lopez the prosecutor engaged in misconduct that deprived Agundis of a fair trial. We must therefore determine whether prosecutorial misconduct occurred and, if so, whether it mandates a new trial.

As to the first question, we hold that there was prosecutorial misconduct following the court's decision to sustain the objection to testimony about Thornton's conversation with Lopez. The district court had stricken from the record and instructed the jury to disregard Thornton's testimony that he was speaking with David Lopez "and asked him to identify anyone standing at the police car." Instead of abandoning his pursuit of this evidence, the prosecutor then asked another

6. By the time argument was heard on the objection outside of the jury's presence, the district court clearly was aware of the hearsay implications of Thornton's testimony. The implications were not as readily apparent when objection was first made during the prosecutor's examination of Thornton. In retrospect, it would have been preferable for the district court to have sustained defense counsel's hearsay objection before the content of Thornton's question to Lopez was related in front of the jury. *See Gomez*, 126 Idaho at 705, 889 P.2d at 734. However, a trial court cannot be expected, absent a motion in limine, to always anticipate the ultimate destination of a particular line of questioning. A timely motion in limine could have alerted the judge to this issue and prevented elicitation of the objectionable testimony before the jury.

question referring to Thornton's conversation with Lopez despite the court's ruling, moments before, sustaining the defendant's objection to this line of questioning. Whether the act was intentional or inadvertent, the prosecutor effectively disregarded the substance of the district court's ruling and so crossed the line of permissible conduct.

■ This holding does not, however, end our inquiry. A conviction will not be reversed for error in the trial unless a substantial right of the defendant is affected. I.C.R. 52; I.R.E. 103. The test for harmless error where there has been prosecutorial misconduct is the same as that for tainted evidence. *State v. Hodges,* 105 Idaho 588, 593 n. 3, 671 P.2d 1051, 1056 n. 3 (1983). An error will be deemed harmless if the appellate court is "convinced beyond a reasonable doubt that the same result would have been reached had the evidence been properly excluded." *State v. LePage,* 102 Idaho 387, 396, 630 P.2d 674, 683 (1981), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981). *See also State v. Zimmerman,* 121 Idaho 971, 976, 829 P.2d 861, 866 (1992); *State v. Boman,* 123 Idaho 947, 950–51, 854 P.2d 290, 293–94 (Ct.App.1993). For the following reasons, we are convinced beyond a reasonable doubt that the prosecutorial misconduct here was harmless.

■ First, before the prosecutor's renewed allusion to the conversation, the district court had already instructed the jury to disregard Thornton's testimony that he had asked Lopez if he could "identify anyone standing there." Where improper testimony arises and the trial court promptly instructs the jury to disregard the evidence, it must be presumed that the jury followed the trial court's direction entirely. *State v. Hedger,* 115 Idaho 598, 601, 768 P.2d 1331, 1334 (1989); *State v. Rolfe,* 92 Idaho 467, 471, 444 P.2d 428, 432 (1968); *State v. Boothe,* 103 Idaho 187, 192, 646 P.2d 429, 434 (Ct.App. 1982). Given the court's direction here, we must assume that the jury disregarded Thornton's testimony about his question to Lopez.

Second, Agundis's claim of harmful error would be stronger if Lopez's hearsay identification had been the sole source of identification of Agundis, but it was not. Before the "conversation" testimony arose, Thornton had already testified that when he saw Agundis in detention at the Albertson's parking lot, he concluded that Agundis was the second man Thornton had chased earlier. Thornton testified that this conclusion was based on, "What I had seen personally and what I knew." He also testified that the man he had seen was a Hispanic male and appeared to be the same height, weight, and age as Agundis. This testimony diminishes the prospect that the jury would have inferred that Thornton's statement, "That's him," was based upon some identification made by Lopez rather than upon Thornton's own recognition of Agundis.

In addition to Thornton's identification, a significant amount of circumstantial evidence was presented at trial to establish Agundis's identity as the second man who fled from Thornton. The police officer that initially detained Agundis had traveled to the area of the second man's flight. The officer testified that Agundis was the only pedestrian in the area that fit the description given by Thornton. Testimony from neighborhood residents established that the second man had run through yards covered with freshly fallen snow. When apprehended, Agundis had snow on his trousers up to the knees, and when the officer first saw Agundis, he appeared "tired." The defense presented no evidence to attempt to explain Agundis's presence in the area on the day in question.

As previously discussed, Agundis was also linked to Lopez through their use of a common address. In addition, the Western Union money transfers referenced in Section II(A) above directly linked Lopez to Joseph Pennazoli, who resided in Coeur d'Alene. A paid informant testified that she had seen Agundis inside Pennazoli's residence. She also had observed Agundis get in a car bearing a license plate that belonged to an individual residing at "828 5th Ave Apt C, Pasco, Washington," an address notably similar to that linking Agundis to Lopez.

In view of the considerable amount of independent evidence, essentially unrebutted by the defense, that identified Agundis as the

**598**

second man who fled from Agent Thornton, and in view of the district court's directive to the jury to disregard Thornton's testimony that was designed to convey hearsay, we hold that the misconduct of the prosecutor was harmless beyond a reasonable doubt.

## IV.

### CONCLUSION

We affirm the district court's denial of Agundis's motion to suppress evidence, and we find no error in the district court's disposition of evidentiary issues raised at trial. Although there was misconduct in the prose-

cutor's failure to comply with the court's ruling excluding evidence of a conversation between Agent Thornton and David Lopez, we find this misconduct harmless beyond a reasonable doubt. The judgment of conviction is affirmed.

WALTERS, C.J., and PERRY, J., concur.