IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 43354

| STATE OF IDAHO, | ) | 2016 Opinion No. 58 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: September 1, 2016 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| EVERETT C. GOTTARDI, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cheri C. Copsey, District Judge.

Order denying motion to suppress and judgment of conviction, affirmed.

Eric D. Fredericksen, Interim State Appellate Public Defender; Jason C. Pintler, Deputy Appellate Public Defender, Boise, for appellant. Jason C. Pintler argued.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

HUSKEY, Judge

Everett C. Gottardi appeals from his judgment of conviction for possession of a controlled substance, methamphetamine. Specifically, Gottardi alleges the district court erred in denying his motion to suppress. For the reasons set forth below, we affirm the order denying the motion to suppress.

## I.

## FACTS AND PROCEDURE

Boise police officers received a request from the United States Marshals Service office to assist in locating one of the top-ten most wanted felons from Nevada who was wanted on delivery of controlled substance charges. The officers received information about the location of the felon and began surveilling her apartment in Boise. At dusk, officers observed Gottardi leave the apartment, drink a beer outside, and take items from a pickup truck belonging to the felon. Officers also observed Gottardi walk in and out of the apartment without knocking. A short time

later, Gottardi left the apartment, looked up and down the street, and walked to a nearby convenience store. While Gottardi was gone, the officer testified he saw the felon "come outside really quick and then go back [inside]." Gottardi returned by car approximately ten minutes later and was dropped off on the street instead of at the felon's apartment. Gottardi walked to the apartment and as he knocked on the apartment door, the officer immediately approached him. The plainclothes officer identified himself and told Gottardi he was looking for the felon. Gottardi blankly stared at the officer and did not respond. The officer knocked on the apartment door and told Gottardi to move back.[1] The officer testified:

> I asked him to move back and he moved back a little bit, but I didn't say stand right there. I didn't particularly tell him where to stand. I asked him to-- motioned with my arm to move back and he takes a very small step back and stood there.

The felon answered the door, and the officer testified "things kind of escalated very quickly." Other officers came to get the felon out of the apartment and calm her because she became "very emotional, very dramatic." While officers attempted to calm the felon and verify her identity, one officer asked Gottardi if he had any weapons. Gottardi told the officer he had a knife and the officer conducted a frisk of Gottardi. The officer testified Gottardi appeared nervous, but was cooperative. The officer discovered a partially opened pocket knife tucked into Gottardi's belt. The officer continued the frisk and felt a hard object in Gottardi's pocket. The officer asked, "Hey, what's that? Is that a pipe?" Gottardi admitted the object was a pipe and told the officer he had a "little baggy." The officer asked, "Is that shake or what is it?" Gottardi told the officer it was methamphetamine. As soon as Gottardi admitted he had a pipe and methamphetamine, the officer placed Gottardi under arrest. The search incident to arrest revealed the pipe and methamphetamine that Gottardi admitted were in his possession. The State charged Gottardi with felony possession of a controlled substance, methamphetamine, and misdemeanor possession of drug paraphernalia.

Gottardi filed a motion to suppress evidence, arguing the evidence was the fruit of an unlawful detention and frisk. Following a hearing, the district court denied the motion, finding the detention and the frisk were constitutionally reasonable. Pursuant to a plea agreement, Gottardi conditionally pleaded guilty to possession of a controlled substance, methamphetamine,

---

[1]  It is unclear the exact language the officer used when speaking to Gottardi. In his testimony, the officer stated he told Gottardi to "move back," "move aside," and "back up." For consistency in this opinion we will use the expression "move back."

reserving his right to appeal the district court's denial of his motion to suppress. The second charge was dismissed. The district court imposed a unified seven-year sentence, with three years determinate. Gottardi timely appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

Gottardi alleges he was illegally stopped and frisked by the officer and therefore, the district court erred in denying his motion to suppress the pipe and methamphetamine. The Fourth Amendment to the United States Constitution guarantees the right of every citizen to be free from unreasonable searches and seizures. Although Gottardi raised in his motion to suppress that both the state and federal constitutions were violated, on appeal he recognizes the issue was not addressed under the state constitutional analysis and agrees only the judicial interpretation of the Fourth Amendment is applicable to his claims.

Generally, evidence obtained as a result of an unreasonable search or seizure must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). A warrantless search is presumptively unreasonable unless it falls within certain special and well-delineated exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Ferreira*, 133 Idaho 474, 479, 988 P.2d 700, 705 (Ct. App. 1999). In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court created a stop-and-frisk exception to the Fourth Amendment warrant requirement. The stop and the frisk constitute two independent actions, each requiring a distinct and separate justification. *State v. Babb*, 133 Idaho 890, 892, 994 P.2d

3

633, 635 (Ct. App. 2000); *State v. Fleenor*, 133 Idaho 552, 556, 989 P.2d 784, 788 (Ct. App. 1999).

The stop is justified if there is a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491 (1983); *Terry*, 392 U.S. at 30; *State v. DuValt*, 131 Idaho 550, 553, 961 P.2d 641, 644 (1998); *Ferreira*, 133 Idaho at 479, 988 P.2d at 705. However, merely because there are reasonable grounds to justify a lawful investigatory stop, such grounds do not automatically justify a frisk for weapons. *Babb*, 133 Idaho at 892, 994 P.2d at 635. An officer may frisk an individual if the officer can point to specific and articulable facts that would lead a reasonably prudent person to believe that the individual with whom the officer is dealing may be armed and presently dangerous and nothing in the initial stages of the encounter serves to dispel this belief. *Terry*, 392 U.S. at 27; *Babb*, 133 Idaho at 892, 994 P.2d at 635; *Fleenor*, 133 Idaho at 555, 989 P.2d at 787. In our analysis of a frisk, we look to the facts known to the officer on the scene and the inferences of risk of danger reasonably drawn from the totality of those specific circumstances. *Babb*, 133 Idaho at 892, 994 P.2d at 635; *Fleenor*, 133 Idaho at 555, 989 P.2d at 787.

**A.     The Stop Was Constitutionally Valid**

We must first determine when, if at all, Gottardi was seized. Then, if a seizure did occur, whether that seizure was based on reasonable and articulable suspicion of criminal activity. Gottardi argues he was illegally seized when the officer approached him at the apartment door and told Gottardi to move back because the officer did not have reasonable, articulable suspicion of criminal activity. The State argues Gottardi was not seized until the officer frisked Gottardi because it was not until the frisk that Gottardi was not free to leave. Alternatively, the State maintains if Gottardi was seized when told to move back, under the totality of the circumstances, the officer had a reasonable suspicion based on specific, articulable facts to seize Gottardi. The district court determined there was no seizure when the officer told Gottardi to move back. The district court found, "this is at most an investigative detention and I'm not even sure I would even call it a seizure because it was very short and I didn't hear anything on the tape that said-- that indicated that Mr. Gottardi was required to stay."

**1.     Gottardi was not seized when the officer contacted him**

There is substantial evidence to support the district court's finding that when the officer approached Gottardi at the front door of the apartment and told him to move back, the encounter

4

was consensual. A seizure does not occur simply because a police officer approaches an individual on the street or other public place and asks if the individual is willing to answer some questions or puts forth questions if the individual is willing to listen. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Royer*, 460 U.S. at 497. Only when an officer, by means of physical force or show of authority, restrains the liberty of a citizen may a court conclude that a seizure has occurred. *Bostick*, 501 U.S. at 434. The critical inquiry is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he or she was not at liberty to ignore the police presence and go about his or her business. *Id.* at 436.

The United States Supreme Court, in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) stated:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

An officer's verbal request or command can amount to a seizure of a person if, in view of all of the circumstances surrounding the incident, the command would cause a reasonable person to believe he was not free to leave and the person accedes to the command. *Id.* at 554; *see also*, *State v. Harwood*, 133 Idaho 50, 53, 981 P.2d 1160, 1163 (Ct. App. 1999); *State v. Agundis*, 127 Idaho 587, 590-93, 903 P.2d 752, 755-56 (Ct. App. 1995).

In applying the circumstances suggestive of a seizure listed in *Mendenhall*, Gottardi was not seized when the officer approached Gottardi at the apartment door. The record demonstrates that only one plainclothes officer approached Gottardi at the apartment door; the officer identified himself with his badge, but did not draw his weapon; the officer did not physically touch Gottardi until the frisk; and finally, while the officer did instruct Gottardi to move back, the officer never instructed Gottardi to stay in the vicinity or stand in a certain place. In *United States v. Thornton*, 463 F.3d 693, 698 (7th Cir. 2006), the court held there was no seizure when officers at a gas station's door asked two citizens exiting the gas station to step aside to answer questions. *See also State v. Linenberger*, 151 Idaho 680, 684, 263 P.3d 145, 149 (Ct. App. 2011) (finding no seizure when the defendant was merely asked to step from his boat to the dock); *compare State v. Zuniga*, 143 Idaho 431, 434, 146 P.3d 697, 700 (Ct. App. 2006) (finding there

5

was a seizure when the detective instructed the defendant to sit on a bench while the officer investigated the man's identity).

Further, when the officer informed Gottardi he was looking for the felon and asked Gottardi to move back, a reasonable person in Gottardi's position would not have believed he was under investigation and was not free to leave. Under the totality of circumstances surrounding the incident and applying the *Mendenhall* factors, this was a consensual encounter and Gottardi was free to leave; thus, there was no seizure when the officer approached Gottardi outside the apartment.

### 2. There was reasonable and articulable suspicion for the seizure

The district court further concluded that even if there was a seizure when the officer told Gottardi to move back, the seizure was permissible because the officer had reasonable and articulable suspicion that Gottardi was engaged in criminal activity. The district court found there was reasonable and articulable suspicion because:

> Mr. Gottardi obviously knew [the felon] who was a wanted--a ten most wanted [person] from Nevada and was wanted on a warrant for some sort of delivery of a controlled substance and that Mr. Gottardi obviously knew her because he was going in and out of the residence multiple times. And, in fact, when he testified, he said that he didn't need to knock. So obviously he had some familiarity.
> He was also observed for some period of time during that time. And the officer knew that this woman was wanted for drug charges. [The officer] observes behavior which raises a suspicion as to either Mr. Gottardi and--he sees him consuming alcohol in the late afternoon outside of the residence . . . .
> He sees him walk away toward a convenience store, come back in another vehicle . . . .
> [The officer] testified that being dropped off in the street instead of a more logical place is something that with his training he had observed before. He sees [Gottardi] then start to approach the front porch . . . .
> So I find that there's--that the detention such as it was temporary, it was limited, and it did not last any longer than to effectuate the purpose of the stop.

There was substantial evidence to support the district court's alternative finding that there was reasonable suspicion of criminal activity. The officers had a warrant for a felon wanted on drug delivery charges. The officers knew the felon resided at the apartment where they observed Gottardi coming and going. Further, the officer testified that in his experience, Gottardi's behavior of scanning the area outside the felon's apartment was consistent with behavior of a lookout. The officer also testified he observed Gottardi walk away from the apartment, return a

6

short time later in a vehicle, and be dropped off on the street instead of in front of the apartment. The officer testified:

> I worked in the Narcotics Unit for several years and I know a lot of times dope transactions are done that way, that amount--that quick amount of time where people leave and come back and don't particularly go directly to the house, but are dropped off. Unusual behavior being dropped off out in the street where it would be just as easy for the person to pull in right in front of the apartment and get out and go inside.

In sum, the facts the officer possessed when he approached Gottardi outside the apartment were that Gottardi had some familiarity with the wanted felon, the felon was wanted on drug charges, and Gottardi had engaged in "lookout behavior" and "suspicious" behavior indicative of drug activity. Further, assuming the seizure occurred when the officer conducted the frisk, such a seizure was based on reasonable, articulable suspicion that Gottardi was involved in drug activity. We agree with the district court that these circumstances, taken as a whole, were sufficient to establish reasonable, articulable suspicion that criminal activity involving Gottardi was afoot and Gottardi's seizure was constitutionally permissible.

### 3. There was an alternative basis for the seizure

Even assuming the officers had no reasonable suspicion of criminal activity at the time of the frisk, Gottardi's detention was a lawful temporary detention because he was in the immediate vicinity while the officers effectuated an arrest warrant. The district court held Gottardi's detention was permissible because case law indicates a temporary detention during the execution of a search warrant is lawful. Gottardi argues because the officers were not executing a search warrant, but rather an arrest warrant, his temporary detention is unconstitutional. Where a ruling in a criminal case is correct, though not based upon a correct reason, it still may be sustained upon the proper legal theory. *See State v. Avelar*, 129 Idaho 700, 704, 931 P.2d 1218, 1222 (1997).

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Generally, evidence obtained as a result of an unreasonable search or seizure must be suppressed. *Wong*, 371 U.S. at 485. In *Michigan v. Summers*, 452 U.S. 692 (1981), police officers encountered an occupant outside of the house subject to a search warrant and detained him while they searched the house. In *Summers*, the United States Supreme Court addressed the issue of temporarily seizing the owner of a home outside the home when executing a valid search warrant for the home. *Id.* at 693. In tracing the support for the detention of individuals in the

7

context of a search warrant, the Court noted, "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause." *Id*. at 699. The law enforcement interests are the orderly completion of the search, preventing flight in the event incriminating evidence is found, and the interest of minimizing the risk of harm to the officers, all of which can be achieved "if the officers routinely exercise unquestioned command of the situation." *Id.* at 703.

The Court also noted while the cases relied on to reach the holding were "consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause," those cases also demonstrated "the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*."[2] *Summers*, 452 U.S. at 700. In deciding whether the case fell within the general rule or the exception, the Court looked both to the character of and the justification for the detention.

In analyzing the character of the detention, the Court found it important that a search warrant carried a judicial determination of probable cause that evidence of criminal activity may be found on the premises; thus, a court had already authorized a substantial invasion of the privacy of the people who resided on those premises. *Id.* at 701. The Court explained the officer was unlikely to exploit the detention because the information was likely to be obtained through the search and not the detention, and the search was done in a private residence rather than a public setting, thereby minimizing public stigma. *Id.* The Court also recognized the intrusion was "substantially less" than an arrest. *Id.* at 702.

In defining the justification for the detention, the Court referenced the officers' need to control the scene, protect themselves from attack while they execute a search warrant, prevent the occupants from concealing or disposing of the items described in the search warrant, and ensure the orderly completion of the search. *Id*. at 701-03. Also of concern was the fact that a search for narcotics, because of the nature of the underlying offense, may give rise to sudden violence or the frantic efforts to dispose of evidence. *Id.* at 702.

---

[2]     *See Adams v. Williams*, 407 U.S. 143 (1972).

Ultimately, the Court reasoned, "the connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id*. at 703-04. Notably in *Summers*, there was no particular suspicion that the individual posed a specific danger to the officers, yet the risk of potential harm was still considered a sufficiently significant law enforcement interest to justify the detention. And, although the holding in *Summers* is predicated upon the officers being in possession of a valid search warrant rather than a valid arrest warrant for a third party, other courts have applied the rationale of *Summers*--the need to control the scene and to protect officers and others--to find the detention of a third party based on the arrest warrant of another party is constitutionally permissible.

For example, the court in *United States v. Maddox*, 388 F.3d 1356 (10th Cir. 2004) held it was constitutionally reasonable to detain a third party during the arrest of a subject because of the officers' need to take reasonable steps to ensure their safety after, and while making, the arrest. *Id.* at 1362-63. In *Maddox*, a county deputy and two federal marshals went to execute an arrest warrant in a high-crime area at a house known as a dangerous place. *Id.* at 1358-59. While the marshals were inside executing the warrant, ultimately eight other individuals were detained outside, including Maddox. *Id.* at 1359.

During this time, Maddox's behavior became erratic and the initial deputy asked that Maddox be separated from the group based on the officer's belief that Maddox was dangerous. *Id.* at 1360. After confirming Maddox's identity, the deputy asked Maddox if he had any weapons and Maddox confirmed he did. *Id*. Maddox was handcuffed and searched, revealing methamphetamine and a scale. *Id*. Maddox was charged with various crimes and moved to suppress the evidence seized from him on the grounds that his detention and questioning violated the Fourth Amendment. *Id*. The motion was denied and Maddox entered a conditional guilty plea, reserving the right to challenge the denial of the motion to suppress. *Id.*

The Tenth Circuit affirmed the denial of the motion, holding Maddox's detention in the carport was constitutionally reasonable based on *Maryland v. Buie*, 494 U.S. 325 (1990). In determining there was no reason to distinguish between a protective search within a home and a "protective detention" outside a home, the court noted:

> We hold that *Buie* applies to both protective searches and protective detentions because the Court's reasoning in *Buie* supports treating protective sweeps and protective detentions similarly. In authorizing officers to protect themselves by

9

making a limited search for potentially dangerous individuals, the Court stated that officers may take "reasonable steps to ensure their safety after, and while making, the arrest." Because the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals that are located during the search, we conclude that detaining potentially dangerous persons for the duration of the arrest qualifies as a "reasonable step[ ] to ensure the [officers'] safety."

*Maddox*, 388 F.3d at 1362 (citations omitted).

Thereafter, the court addressed whether the protective detention was limited to inside a home or might include an area immediately outside the home. In defining where a protective detention would apply, the court relied on the *Buie* Court's "arrest scene" language. *Maddox*, 388 F.3d at 1363. Noting the *Buie* Court held protective sweeps protect officers from potentially dangerous individuals that may be nearby, it was appropriate to consider the reasonable threats posed to the officers when drawing the boundaries of the arrest scene in an individual case. *Maddox*, 388 F.3d at 1363.

The court found:

the officer-safety interests at issue in *Buie* are nearly identical to those in play here. As in <u>Buie</u>, the arrest of Ms. Page was done inside the residence. As the Court put it, in that instance "[t]he risk of danger . . . [to law enforcement officers is] as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter . . . [and puts them] at the disadvantage of being on [their] adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."

*Id.* (citing *Buie*, 494 U.S. at 337). The court found Maddox's detention was justified because he was within the geographical area of the arrest scene, regardless of whether the deputy believed Maddox was armed and presently dangerous. However, the court went on to hold that law enforcement officers may only detain individuals at the scene of the arrest who are not within the "immediately adjoining" area of the arrest if the officers "possess a reasonable belief based on specific and articulable facts" that the individual poses a danger to them. *Maddox*, 388 F.3d at 1362. Thus, where an individual is in an area immediately adjoining the home of the arrestee, the individual may be placed in temporary protective detention even in the absence of probable cause or a reasonable suspicion that the individual poses a threat to officer safety. On the other hand, where an individual is on the arrest scene, but is not in an area immediately adjoining the home of the arrestee, the individual may only be detained when officers possess a reasonable suspicion that the individual poses a danger.

10

A similar conclusion was issued in *State v. Valdez*, 68 P.3d 1052, 1056 (Utah Ct. App. 2003). There, the officers had a valid arrest warrant for Young. Upon arriving at and entering into Young's home, the officers agreed to accompany Young to her bedroom to allow her to change her clothes. *Id.* at 1054. Upon entering the bedroom, the officers saw Valdez lying on the bed, apparently asleep and covered with either a blanket or a coat. *Id*. Because Valdez did not respond to the officer's questions, the officer grabbed Valdez, shook him, and demanded to see his hands. *Id*. During the exchange, the officer asked Valdez for his name and identification. *Id*. Ultimately, the officers identified Valdez and arrested him on an outstanding warrant. *Id*. During the search incident to arrest, the officers found controlled substances and Valdez was charged with various crimes. *Id.* at 1059.

Recognizing the officer did not have any reasonable or articulable suspicion that Valdez was committing or attempting to commit a crime, the court nonetheless found the initial seizure was constitutionally valid, although the subsequent search was not. *Id*. The court held, "the limited seizure of a third party during the execution of an arrest warrant may, under certain very limited circumstances, be permissible without the otherwise necessary showing of facts supporting a reasonable suspicion of criminal activities." *Id*. at 1056. The court relied both on *Summers* and *Maryland v. Wilson*, 519 U.S. 408 (1997) in reaching its decision, concluding, "that under certain circumstances officers may detain a person without reasonable suspicion of criminal activity for the sole purpose of 'exercis[ing] unquestioned command of the situation.'" *Valdez*, 68 P.3d at 1058 (citing *Wilson*, 519 U.S. at 410).

The court then analyzed the totality of the circumstance and determined Valdez's detention was "justified at its inception" as necessary for the officers to exercise command of the situation. *Valdez*, 68 P.3d at 1058. However, the court went on to note Valdez's seizure was limited to the reason justifying it--controlling the scene. *Id.* at 1059. As controlling the scene did not require any investigation into Valdez's identity, the officer's request for identification exceeded the scope of the reason justifying the initial detention and unnecessarily expanded both the duration and scope of the initial detention. *Id.* As a result, the evidence obtained following the unreasonable expansion was correctly suppressed. *Id.*

In *Way v. State*, 101 P.3d 203, 209 (Alaska Ct. App. 2004), the court adopted similar reasoning in finding it was constitutionally permissible to restrain third parties at a residence when executing an arrest warrant to prevent interference with the arrest. *Id*. However, the court also held

that once it was determined the fugitive was not present, Way's continued detention was unreasonable. *Id*. at 210.

The above cases illustrate which factors courts use to determine whether the intrusion on a third party's Fourth Amendment right is constitutionally permissible. First, there must be some judicial determination of probable cause--either for a search warrant or an arrest warrant. Second, the courts look to the nexus between the third party and the subject of the warrant. In determining the nexus, the courts look both to the relationship between the third party and the subject of the warrant and the physical proximity of the third party to the subject of the warrant. Fourth, the court determines what, if any, significant law enforcement interests exist. Fifth, and finally, the court balances the intrusion on the third party's Fourth Amendment right and the law enforcement interests.

Similarly here, the officer's sole reason for approaching Gottardi was to execute the felony arrest warrant. As detailed above, as the officer knocked on the door, he told Gottardi to move back. Gottardi only moved about a foot away from the officer. When the felon answered the door and was told she was under arrest, the scene became chaotic. The officer testified, the felon's dramatic and emotional behavior "usually tends to amp up the other people potentially that are present at the immediate scene . . . ." While other officers assisted in calming the felon, the officer asked Gottardi if he had any weapons. Gottardi responded he had a knife, so the officer conducted a frisk. Because the officer was unaware of Gottardi's relationship with the felon and had seen Gottardi go in and out of the felon's apartment without knocking, it was reasonable for the officer to assume Gottardi was familiar with the felon and to believe Gottardi may attempt to assist the felon in avoiding arrest. Thus, Gottardi's limited detention was reasonable because it was minimal and effectuated in order to ensure officer safety.

**B. The Frisk Was Constitutionally Valid**

The next issue is whether Gottardi was illegally searched. Gottardi alleges there were no specific and articulable facts that would lead a reasonably prudent person to believe that he may have been armed and dangerous, particularly because the officer testified that Gottardi was cooperative.[3] Thus, according to Gottardi, the officer was not justified in performing a *Terry* frisk of Gottardi. Gottardi relies on *State v. Henage*, 143 Idaho 655, 152 P.3d 16 (2007) to

---

[3] Although the district court found Gottardi was uncooperative, that finding is not supported by substantial and competent evidence in light of the officer's testimony to the contrary.

12

support his argument. In *Henage*, this Court determined the officer's frisk of Henage was not justified because the totality of the circumstances did not create a reasonable inference that he posed a safety risk to the officer or others. *Id*. at 662, 152 P.3d at 23. The officer testified that during his encounter with Henage, Henage admitted to having a knife and was acting nervous, but he was otherwise cooperative and polite. *Id*. The officer also testified he had known Henage for several years and never had a combative experience with him. *Id*. The Court determined the officer failed to connect Henage's nervousness with a risk to the officer's safety. The Court noted the officer did not "articulate any furtive movements or behavior from which a person in [his] position could reasonably conclude [that Henage] posed any risk." *Id*. Accordingly, the Court determined the officer failed to point to specific and articulable facts that would reasonably warrant a search for weapons. *Id*.

Following the Idaho Supreme Court's decision in *Henage*, in *State v. Bishop*, 146 Idaho 804, 203 P.3d 1203 (2009), the Supreme Court identified several factors that influence whether a reasonable person in the officer's position would conclude that a particular person was armed and dangerous, including:

> whether there were any bulges in the suspect's clothing that resembled a weapon; whether the encounter took place late at night or in a high crime area; and whether the individual made threatening or furtive movements, indicated that he or she possessed a weapon, appeared nervous or agitated, appeared to be under the influence of alcohol or illegal drugs, was unwilling to cooperate, or had a reputation for being dangerous.

*Id*. at 819, 203 P.3d at 1218. Whether any of these considerations, taken together or by themselves, are enough to justify a *Terry* frisk depends on an analysis of the totality of the circumstances. *Bishop*, 146 Idaho at 819, 203 P.3d at 1218.

In this case, in denying Gottardi's motion to suppress, the district court determined the officer had reasonable suspicion that Gottardi was armed and dangerous based on the following facts: (1) Gottardi was nervous; (2) appeared to be acting as a lookout; (3) was observed consuming alcohol; (4) was slow and lethargic upon the officer's approach; (5) did not respond to the officer when told the officer was there for the felon; (6) was seen coming and going from the wanted felon's apartment; (7) did not step back much upon the officer's request; (8) admitted to having a weapon; (9) it was nearly dusk; and (10) Gottardi is over six feet tall. Based on the totality of circumstances, the district court determined the frisk of Gottardi was justified.

We conclude that it was objectively reasonable for the officer to conduct a frisk of Gottardi in this instance. Similar to *Henage*, Gottardi admitted he had a knife in his pocket and appeared to be nervous. However, unlike *Henage*, the officer here testified about Gottardi's movements and behavior which led him to reasonably conclude that Gottardi posed a risk to officer safety. Here, the encounter occurred at near dusk, the officer witnessed Gottardi engaging in "lookout behavior," and Gottardi stayed within close physical proximity to the officer after the officer told Gottardi to move back. Unlike the officer in *Henage* who had prior encounters with Henage before the incident in question, there is no indication that the officer in this case had any prior dealings with Gottardi.

Further, applying the *Bishop* factors to the facts at hand, the officer observed Gottardi drinking alcohol and engaging in behavior consistent with drug-related activity. The officer did not know if Gottardi was intoxicated, but noted Gottardi appeared nervous. Gottardi also appeared to be acquainted with a felon who was wanted on drug-related charges. Finally, Gottardi admitted he had a weapon. Under the totality of the circumstances, the officer was justified in conducting a *Terry* frisk of Gottardi. Finally, the frisk occurred during a chaotic scene where the officers were attempting to arrest a "very emotional, very dramatic" felon, whose behavior, according to the officer, "usually tends to amp up the other people potentially that are present at the immediate scene" and Gottardi was in close physical proximity to the officer during this chaotic scene. As such, the officer's belief that Gottardi was armed and presently dangerous was reasonable.

Once Gottardi admitted he was carrying a weapon, it was reasonable for the officer to continue the frisk after locating the knife. In *State v. Martin*, 146 Idaho 357, 360, 195 P.3d 716, 719 (Ct. App. 2008), the officer conducted a frisk and located and removed a knife. *Id*. The officer continued the frisk, which led to the officer feeling additional hard objects in Martin's pockets. *Id*. This Court concluded the officer's concern for his safety was objectively reasonable and the frisk was justified based on the totality of the circumstances, including the fact that Martin admitted to carrying a weapon, and the officer's testimony that where there is one weapon, there are sometimes others.

Similarly, the officer in this case located and removed a half-opened pocket knife in Gottardi's belt. The officer explained the knife "was rigged just to grab onto the handle and flip it open and an immediate weapon would be present." Like the officer in *Martin*, the officer

14

testified he continued the frisk after finding the knife because where there is one weapon, there are sometimes others. The frisk led the officer to feel an additional hard object in Gottardi's pocket. The officer asked, "What's that? Is that a pipe?" Gottardi admitted that it was a pipe. The officer then asked Gottardi if he had anything else, and Gottardi answered, "I have a little baggy," and Gottardi told the officer it was methamphetamine. Because it was objectively reasonable to frisk Gottardi under these circumstances, the officer's continued frisk which led to the discovery of the pipe and methamphetamine was also objectively reasonable. The district court held it was objectively reasonable for the officer to conclude that a weapons frisk of Gottardi was necessary for the protection of the officers and others. The district court further held the evidence found during this search was constitutionally admissible. We agree with the district court.

## IV.
## CONCLUSION

Accordingly, we hold there was no seizure when the officer told Gottardi to move back. Even if there was a seizure, the seizure was a lawful investigatory detention based on the officer's reasonable, articulable suspicion that Gottardi was involved in criminal activity. Alternatively, it was reasonable for officers to detain Gottardi when they executed an arrest warrant for a third party. Finally, there is substantial evidence in the record to support the district court's conclusion that it was objectively reasonable for the officer to frisk Gottardi. Therefore, we affirm the district court's denial of Gottardi's motion to suppress and judgment of conviction.

Chief Judge MELANSON and Judge GRATTON **CONCUR**.