**STATE of Alaska, Petitioner,**

v.

**Donald WAGAR, Respondent.**

**No. S–10369.**

Supreme Court of Alaska.

Nov. 7, 2003.

**2.** *Id.*

**3.** *Id.* at 835–36.

**4.** *Id.* at 835.

**5.** *Id.* at 836 (footnote omitted).

**6.** Kenai Peninsula Borough Code (KPB) 21.20.230.

**7.** KPB 17.10.080 & 22.40.190.

Douglas H. Kossler, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

Quinlan Steiner, Assistant Public Defender, Barbara K. Brink, Public Defender, Anchorage, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

The question here is whether an officer conducting a pat-down search for weapons during an investigatory stop who feels an object that he reasonably believes might be used as a weapon may examine the object to confirm that it is not a potential weapon. The court of appeals answered this question in the negative, holding that the officer must have a reasonable belief that the object *is* a weapon, not merely that it might be used as a weapon. We answer in the affirmative because officer safety is better served by permitting searches for potential weapons and because this is the teaching of the leading treatise on search and seizure law.

## II. FACTS AND PROCEEDINGS

The facts and the initial proceedings are stated by the court of appeals:

At about 10:00 p.m. on August 8, 1997, Othal C. Madden, a security manager for Brown Jug, Incorporated, was in a parking lot by the Brown Jug liquor store at 26th Avenue and Spenard Road. Madden was in the parking lot to look for adults purchasing alcohol for minors or minors trying to buy alcohol out of the Brown Jug store. Madden saw Wagar and a female companion pull into the lot in a relatively new Dodge pickup. Wagar was driving. Madden saw Wagar throw and break a bottle into the parking lot. Then Wagar got out, went to the bed of the pickup, took a bottle of beer out of a cooler, and got back into the driver's side. Shortly thereafter, Wagar got out again, left the door open, and urinated in the parking lot.

Madden watched the pickup for about an hour. During the hour, Madden saw Wagar return to the cooler for what appeared to be several more beers. Madden also saw the passenger repeatedly put her hand to her nose, covering a nostril, and lean down as if she were snorting cocaine. Madden decided to defer calling the police about what he saw until he was ready to wrap up or until the pickup started to leave because Madden did not want his "sting" interrupted by a "parking lot ... full of police cars." When Madden was ready to go, he called Alcohol Beverage Control Board Investigator John F. Bilyeu on a cell phone. Bilyeu was approximately 200 yards away in a patrol car with Anchorage Police Officer Derek Hsieh. Bilyeu and Hsieh were working together that night investigating potential alcohol violations.

Madden told Bilyeu that he had seen a man (Wagar) consume four or five beers and urinate in the parking lot. Madden told Bilyeu that the woman passenger appeared to be using cocaine. Madden also described the Dodge to Bilyeu. According to Bilyeu, Madden told him that both occupants appeared to be using cocaine. Bilyeu relayed this version of Madden's report to Hsieh. Bilyeu and Hsieh, who had

just pulled up to Chilkoot Charlie's to walk through the bar, instead went directly to the parking lot where the Dodge was parked. As Hsieh and Bilyeu pulled into the lot, Madden pointed to the Dodge, and Hsieh drove up to the truck and parked.

Wagar and his companion were getting out of the truck when Hsieh and Bilyeu arrived. Hsieh contacted Wagar and noticed that he smelled of alcoholic beverages. Bilyeu contacted the companion. Wagar put his hands in his jeans pockets, although Hsieh told him not to do that. Wagar turned away from Hsieh, an action that Hsieh described as "blading," and "kind of a danger sign that a person may be attempting to hide something or ... positioning their body in some type of fighting posture[.]" Because Wagar put his hands in his pockets and turned away, Hsieh testified that he felt he was "potentially ... at risk[.]" Hsieh frisked Wagar for weapons.

Hsieh found nothing of note until he got to Wagar's T-shirt pocket. In that pocket, Hsieh felt a pack of cigarettes, a lighter, and an unknown object that was hard, pointed, and approximately three inches long. Hsieh asked Wagar what the object was, and Wagar said he did not know. Hsieh testified that he became "very nervous" because he thought that the object might be a weapon. As Hsieh manipulated the object with his fingers, he looked into the T-shirt pocket and saw that the object was a glass vial with a white powdery substance that looked like cocaine. Hsieh seized the vial and arrested Wagar.

The grand jury indicted Wagar on one count of fourth-degree misconduct involving a controlled substance. Wagar moved to suppress the cocaine Hsieh seized. Superior Court Judge Larry D. Card held an evidentiary hearing on Wagar's motion. Judge Card found that Wagar was subjected to an investigatory stop at the point Hsieh touched him, and that this investigatory stop was supported by Hsieh's reasonable suspicion of criminal activity. Judge Card concluded that Hsieh's reasonable suspicion justified a pat-down for weapons and denied Wagar's motion. Wagar en-

tered a *Cooksey*[1] plea, reserving his right to appeal the denial of his motion to suppress. Judge Card sentenced Wagar to eighteen months' imprisonment with seventeen months suspended.[2]

On appeal, Wagar raised three points. First, he contended that the investigatory stop conducted by Officer Hsieh was not supported by reasonable suspicion "that imminent public danger exists or that serious harm to persons or property has recently occurred."[3] Second, even if the stop were permissible, Wagar argued that the frisk was not.[4] Third, even if the stop and the frisk were permissible, Wagar argued that Hsieh exceeded the allowable scope of a pat-down search for weapons when Hsieh looked into Wagar's T-shirt pocket in order to determine what the unknown object was.[5]

On the first two points, a majority of the court of appeals concluded that the superior court's determinations were appropriate.[6] But on the third point, the court of appeals concluded that the superior court's findings were inadequate and remanded the case for "findings on whether the object felt like a typical weapon or whether Officer Hsieh knew of specific and articulable facts that support a reasonable belief that the unknown object was an atypical weapon that Wagar could use to harm Officer Hsieh or others nearby."[7]

On remand, the superior court conducted a supplemental evidentiary hearing. The superior court purported to answer the court of appeals's second question in the affirmative, stating:

> This court finds after hearing that the glass vial discovered by Officer Hsieh was not a typical weapon which was apparent to the Court of Appeals. Having not found it a typical weapon, Officer Hsieh had to have specific and articulable facts that would support a reasonable belief that the unknown object was an atypical weapon that it could use—to harm the officers before he examined the contents of the pocket.
>
> As he testified at the hearing on October 13, 2000, it was a small, unidentified, hard object and he was curious as to what it might be because it was hard and pointed and approximately three inches long.

1. *See Cooksey v. State*, 524 P.2d 1251 (Alaska 1974).

2. *Wagar v. State (Wagar I )*, 2000 WL 799324 *1–2 (Alaska App., June 21, 2000).

3. *Id.* at *2. This is the Alaska standard under which an investigatory stop is justified. *See, e.g., Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976). The standard is somewhat more stringent than the standard for investigatory stops under the federal constitution. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), requiring a reasonable belief "that criminal activity may be afoot." *Coleman* adopted the objective test expressed in *Terry* for determining when an officer's suspicion is reasonable:

> [T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.... And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*Coleman*, 553 P.2d at 45 (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868).

4. *Wagar I*, 2000 WL 799324 at *3. Not every legitimate stop can be accompanied by a frisk. What is needed is a reasonable belief at the time of the initiation of the frisk that the suspect may be armed and dangerous. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*See also* 4 Wayne R. LaFave, Search and Seizure § 9.5(a), at 250 (3d ed. 1996) ("[I]t should not be assumed that whatever might happen between the initiation of the stop and the initiation of the frisk is of no relevance, for this is not the case.").

5. *Wager I*, 2000 WL 799324 at *3. As the court of appeals noted, the permissible scope of a pat-down search for weapons is ordinarily "limited to the person's exterior clothing. Unless the pat-down search discloses the presence of a potential weapon, further intrusion into the person's pockets is not permitted." *Id.* (citation omitted).

6. *Id.* at *2–3.

7. *Id.* at *5.

Even though he did not feel it was a weapon, he became very nervous because he thought that the object could be used as a weapon or might be a weapon, in his words.

The officer proceeded to discuss a time in his training when he was given opportunity to do a practice attack on the training officer, and the training officer took a small object which he could not even see that was pointed and placed it at or about his neck which caused the officer to become disoriented.

Thus, the question is whether it was an atypical weapon that he felt and can be used to harm the officers is answered in the affirmative. The officer's feelings were reasonable. That it was an atypical weapon even if nothing more than, from the court's perspective, a pencil with a point that could be used to harm the officer.

Thus, having said that, this court finds that it was a reasonable belief that it was an atypical weapon. And, therefore, the court affirms its findings previously issued.

Upon receiving the superior court's findings the court of appeals stated that "the superior court found the police were justified in removing the vial from Wagar's pocket because the officer who performed the search reasonably believed the unknown object could potentially be used as a weapon." [8] The court concluded that this was not the correct test.[9] Instead, what is required are "affirmative reasons-specific and articulable facts—to support a reasonable belief the unknown object was indeed an atypical weapon." [10] The court of appeals found that the superior court's findings fell short of determining that Officer Hsieh had a reasonable belief that the unknown object was an atypical weapon and thus reversed the judgment of the superior court.[11]

We granted the state's petition for hearing.

## III. DISCUSSION

■ We disagree with the court of appeals's decision. In our view, what is needed to justify a further examination of an unknown object felt in a frisk for weapons is a reasonable belief on the part of the officer, based on "specific and articulable facts ... taken together with rational inferences from those facts," [12] that the object may be used as a weapon.

This conclusion is supported by the rationale justifying a weapons search in connection with investigatory stops when the officer has reason to believe that the suspect may be armed and dangerous. The overarching rationale is officer safety. As the *Terry* Court observed: "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." [13] The distinction between objects that are not shaped like typical weapons but may nevertheless be weapons and similar objects that are merely potentially usable as weapons seems extremely tenuous. If there is a difference it lies in the intent of the bearer of the object. But this intent is not necessarily apparent to the officer conducting the frisk. In our view, the distinction inherent in the court of appeals's decision is too vague to serve as a dividing line between permissible and impermissible searches that are conducted in order to ensure officer safety.

Our conclusion that the court of appeals too narrowly limited searches after a pat down to objects that are reasonably believed to be weapons rather than objects that are reasonably believed to have the potential for use as weapons is also supported by the leading text on search and seizure, Professor LaFave's SEARCH AND SEIZURE. According to LaFave, the critical issue is "what properly may be deemed *a potential weapon* in this

8. *Wagar v. State (Wager II )*, 2001 WL 1143307 *1 (Alaska App., Sept.26, 2001).

9. *Id.*

10. *Id.*

11. *Id.*

12. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

13. *Id.* at 23, 88 S.Ct. 1868.

context."[14] LaFave precedes this statement with the following discussion:

> [A]nother important question which must be resolved in order to assess the conduct of a police officer who has performed a frisk is that of what tactile sensations produced by the pat-down will justify a further intrusion into the clothing of the suspect.
>
> At the outset, it must be asked what the legal test is at this point. In *Terry*, the Court stressed that after patting down the suspects Officer McFadden "did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons." But surely this does not mean that the policeman must know beyond any doubt that what he has felt is a weapon; the officer "need not be absolutely certain that the individual is armed." Sometimes it is said that he must feel "an object which he reasonably believes to be a dangerous weapon," which may be an appropriate test if this reasonable belief does not require that it be possible to determine that it is more probable than not that the object is a weapon. As some courts put it, it must be asked whether the object "feels like a weapon" or was one the officer "reasonably believed could have been" a weapon, or whether on the other hand there

was anything in the officer's "perception to indicate it was not a weapon either because of size or density."

> In making a judgment on this point in a particular case, *it may be critical to determine what properly may be deemed a potential weapon in this context.*[15]

After warning against accepting fanciful speculations as to what might reasonably be believed to be a weapon,[16] LaFave continues:

> Under the better view, then, a search is not permissible when the object felt is soft in nature.[17] If the object felt is hard, then the question is whether its "size or density" is such that it might be a weapon.... Under this approach, courts have upheld as proper searches which turned up certain objects other than guns, such as a pocket tape recorder, a pipe, a pair of pliers, cigarette lighter, several keys taped together, a metal money clip full of money, tightly wrapped bags of crack cocaine, or a prescription bottle.[18]

We agree with LaFave. In the context of this case the relevant question was whether the object Hsieh felt in Wagar's T-shirt pocket could, based on "specific and articulable facts," reasonably be believed to be a potential weapon, not as the court of appeals held, whether it was indeed a weapon.[19]

---

**14.** 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE· A TREATISE ON THE FOURTH AMENDMENT § 9.5(c), at 277 (3d ed.1996) (emphasis added).

**15.** *Id.* at 276–77 (citations omitted) (emphasis added).

**16.** *Id.* at 277 (using as an example "a rubber water pistol loaded with carbolic acid") (citing *People v. Armenta*, 268 Cal.App.2d 248, 73 Cal. Rptr. 819 (1968)).

**17.** LaFave quotes the admonition of *People v. Collins*, 1 Cal.3d 658, 83 Cal.Rptr. 179, 463 P.2d 403 (1970):

> To permit officers to exceed the scope of a lawful pat-down whenever they feel a soft object by relying upon mere speculation that the object might be a razor blade concealed in a handkerchief, a "sap," or any other atypical weapon would be to hold that possession of any object, including a wallet, invites a plenary search of an individual's person.
>
> LAFAVE, *supra* note 14, at 277.

**18.** *Id.* at 278–79 (citations omitted).

**19.** In deciding this point, we have no occasion to question the validity of prior Alaska cases like *Zehrung v. State*, 569 P.2d 189 (Alaska 1979), and *Jackson v. State*, 791 P.2d 1023 (Alaska App. 1990)—a line of authority that the court of appeals relied on in reaching its decision here. *See Wagar II* at *2–3. These cases are inapposite because they address a narrow point not raised in Wagar's case: an arresting officer's authority, under the search incident to arrest doctrine, where the arrest is not for a crime for which there could be concealable evidence, to open and look inside a small, closed container (in both cases, a wallet) that is not itself suspected of being usable as a weapon, but is lawfully taken into police custody during the arrest and is then searched to see if it might *contain* an atypical weapon. *See, e.g., Jackson*, 791 P.2d at 1028 ("Search of smaller containers which could only contain atypical weapons must be supported by specific articulable facts[.]"). Here, by contrast, Officer Hsieh seized a glass vial from Wagar because he reasonably felt that Wagar might use the vial itself as a weapon, not because he wanted to see if it might contain an atypical weapon; and Wagar challenges only the vial's seizure, not its subsequent search.

■ A denial of a motion to suppress is reviewed in the light most favorable to upholding the trial court's ruling.[20] "The trial court's findings of fact will not be disturbed unless they are clearly erroneous."[21] Whether the trial court's findings support its legal conclusions is a question we answer with our independent judgment.[22] Employing these standards, we conclude that the trial court's decision should be upheld.

■ The trial court found that Hsieh "thought that the object could be used as a weapon" and that this was a reasonable belief. These findings are supported by "specific and articulable facts"—the evidence as to the size, shape, and hardness of the object and Hsieh's training experience—and are thus not clearly erroneous. They also satisfy the appropriate legal standard that an object felt in a pat-down search can be examined if the officer reasonably believes that it might be used as a weapon against the officer or others nearby.

## IV. CONCLUSION

REVERSED and REMANDED for further proceedings in accordance with this opinion.

**20.** *State v. Joubert,* 20 P.3d 1115, 1118 (Alaska 2001).

