J. Lee WAY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8549.

Court of Appeals of Alaska.

Nov. 12, 2004.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In the early morning hours of May 13, 2002, the Alaska State Troopers and the North Pole Police raided a residential apartment because they had received a tip that a wanted fugitive, Richard Noriega, was attending a social gathering there. Some half-dozen officers set up a "perimeter surveillance" around the apartment (apparently waiting for Noriega to emerge, or perhaps waiting to obtain a search warrant), but they entered the apartment without a warrant after one of the occupants looked out and saw the officers.

The officers ordered everyone out of the apartment, and then the officers ordered all of the men to lie face down on the ground and submit to handcuffing. With all of the male occupants prostrate and handcuffed, the officers entered the apartment with a police dog and began a search for Noriega. It turned out that he was not there.

When it became clear that Noriega was not present, the officers left the apartment and began to release all of the people handcuffed on the ground. But before each man was uncuffed, the officers "brought [them] to their feet and searched [them]". Each man was frisked for weapons, and the officers also demanded that each man identify himself (so that the officers could check to see whether any of them had outstanding warrants).

One of the men on the ground was J. Lee Way. Trooper Patrick S. Johnson was already acquainted with Way from a traffic stop the week before. During that traffic stop, the troopers discovered components for a methamphetamine lab in the back of Way's van. The troopers also found a loaded handgun inside the van. Way was not arrested at that time, but his vehicle was impounded, and he was informed that he would be facing felony charges.

Based on that earlier traffic stop, Johnson concluded that Way might be armed and might be under the influence of drugs. For this reason, Johnson pulled Way aside (with his hands still cuffed behind his back) and subjected him to special questioning. During this questioning, Way's jacket pocket gaped open and Johnson observed a syringe inside. Johnson removed the syringe from Way's pocket and examined it; the syringe appeared to have blood on its barrel (thus suggesting that the syringe had been used recently). A further pat-down search of Way's clothing yielded a glass pipe; this pipe field-tested positive for cocaine. Based on these discoveries, Way was arrested and ultimately charged with fourth-degree controlled substance misconduct.

In this appeal, Way contends that the evidence against him was obtained illegally. Way does not dispute the officers' authority to enter the apartment or to order him to leave the apartment. (And we express no opinion on these issues.) However, Way argues that the officers had no authority to detain him at the scene, handcuff him, and subject him to questioning—the actions that led to the discovery of the drug paraphernalia.

The superior court ruled that the officers' actions had been proper because (1) the officers were entitled to temporarily restrain all of the occupants of the apartment while the officers searched the apartment for the fugitive, Noriega, and then, (2) based on the officers' particularized knowledge of Way and his potential dangerousness, the officers were entitled to frisk Way before they released him. Thus, the superior court apparently ruled that the pat-down of Way's pockets would have been legal even if Trooper Johnson had not first observed the syringe in plain view.

*Summary of our decision*

Way does not contest the officers' authority to enter the apartment without a warrant, or the officers' authority to order all of the occupants to leave the apartment while they conducted their search for Noriega. We therefore assume, for purposes of this appeal only, that the officers had this authority.[1] Based on this assumption, and based on the United States Supreme Court's decision in *Michigan v. Summers* (which we discuss below), we agree with the superior court that the officers were authorized to restrain the occupants in some fashion during their search of the apartment.

The next question is whether the officers were authorized to continue to detain Way, and to question him, even after it was clear that the fugitive Noriega was not in the apartment. The officers' sole reason for entering the apartment was to search for Noriega. The officers had no information that any illegal activity was occurring in the apartment. That is, the officers had no articulable basis for believing that Way had committed a serious crime (other than the drug offense that was discovered during the traffic stop the previous week), and thus Way's continued detention can not be justified on this basis.

Potentially, Way's continued detention could have been justified if the officers reasonably believed that Way had just helped Noriega escape from the apartment. But the officers had the apartment under surveillance and surrounded for some time before they decided to enter. Thus, the officers' failure to find Noriega in the apartment meant that he had not been there for a while. Under these circumstances, the fact that Way was present at the apartment when the officers arrived did not provide a reasonable basis for the officers to infer that Way had aided Noriega, the fugitive they sought.

In sum, the officers in the present case had no articulable basis for continuing to restrain Way after the officers completed their search and discovered that Noriega was not in the apartment.

Nevertheless, the State argues that even if the officers impermissibly held Way after the search for Noriega was completed, the officers were authorized to frisk Way for weapons before they released him—and that this frisk would have revealed the syringe and

1. *See Moreau v. State*, 588 P.2d 275, 280 (Alaska 1978) (holding that, absent exceptional circumstances, potential violations of the Fourth Amendment will not be treated as "plain error").

the glass pipe. As we explain here, we conclude that the State is correct. Way's earlier encounter with the police yielded evidence that Way was involved in drug trafficking, and a firearm was found in his vehicle. These circumstances warranted the officers at the apartment in suspecting that Way might be armed and presently dangerous to them.

For this reason, we agree with the superior court that the officers were authorized to perform a protective frisk of Way's outer clothing—and thus, we conclude that the superior court correctly denied Way's suppression motion.

*The rule announced in Michigan v. Summers, and the cases applying this rule to the service of arrest warrants*

In *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the United States Supreme Court ruled that when police officers serve a search warrant at a residence, the officers have "a limited authority to detain the occupants of the premises" while the officers conduct the judicially authorized search.[2] The restraint of the occupants is justified (1) by the fact that a judicial officer has already authorized a police entry of the residence (based on probable cause to believe that the residence contains evidence of a crime), and (2) by the officers' need to protect themselves from attack while they are executing the warrant, and to prevent the occupants from concealing or disposing of the items described in the search warrant. *Summers*, 452 U.S. at 702–05, 101 S.Ct. at 2594–95.[3]

For the most part, the cases interpreting and applying the *Summers* rule deal with instances in which the police are executing search warrants for evidence of a crime. Courts often reason that, in such circumstances, the prior judicial decision to issue the warrant means that there is reason to suspect that any voluntary occupant of the residence might be involved in the criminal activity described in the warrant, or might be a friend or associate of the people involved in that criminal activity. Thus, the police normally would be justified in temporarily detaining all occupants to make sure that they do not interfere with the search (either by personally attacking or impeding the officers, or by trying to warn others of the officers' presence), and to make sure that the occupants do not attempt to conceal or destroy the evidence for which the police are searching.

These principles are illustrated by the Sixth Circuit's decision in *United States v. Fountain*, 2 F.3d 656 (6th Cir.1993).[4] In *Fountain*, the police were serving a warrant that authorized a search for evidence of illicit drugs. A visitor to the residence, one McEaddy, was handcuffed and ordered to lie face down on the living room floor while the police conducted the search.[5] The court held that McEaddy's detention and restraint were proper under the *Summers* rule:

> Concern for [the] safety of the agents and the need to prevent disposal of any narcotics on the premises ... justified the restraint of the occupants, particularly under the circumstances of this case, where the search was part of a narcotics investigation and weapons had been seized from the home just one month earlier. The character of the intrusion on McEaddy and its justification were reasonable and proportional to law enforcement's legitimate interests in preventing flight in the event incriminating evidence is found and in minimizing the risk of harm to officers. Those concerns plainly outweighed the intrusion experienced by McEaddy in being required to be on the living room floor while the search was completed. And those concerns are the same regardless of whether

---

**2.** *Summers*, 452 U.S. at 705, 101 S.Ct. at 2595.

**3.** *See also State v. Young*, 136 Idaho 711, 39 P.3d 651, 658–59 (Idaho App.2002); *Mercer v. State*, 251 Ga.App. 465, 554 S.E.2d 732, 734 (2001); *People v. Glaser*, 11 Cal.4th 354, 45 Cal.Rptr.2d 425, 902 P.2d 729, 735–36 (1995); *People v. Matelski*, 82 Cal.App.4th 837, 98 Cal.Rptr.2d 543, 549–551 (2000).

**4.** *Overruled on other grounds in Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999).

**5.** *Fountain*, 2 F.3d at 663.

the individuals present in the home being searched are residents or visitors.

... [W]e believe that a valid search warrant plus McEaddy's apparently voluntary connection with the home [to be searched] provided the agents with an easily identifiable and certain basis for determining that suspicion of criminal activity justified [McEaddy's] detention, particularly when the agents did not immediately know whether McEaddy was a resident.

*Fountain,* 2 F.3d at 663 (internal citations omitted).

The court additionally concluded that even after the officers completed their search of the residence (during which they found drugs and three firearms [6]), the officers were justified in briefly continuing their detention of McEaddy and in questioning McEaddy about his potential relationship to the drugs and the weapons found in the house:

> With respect to the [continued] detention, ... [w]e recognize that the agents lacked probable cause to arrest McEaddy immediately following the conclusion of the search, but we conclude, nevertheless, that his continued detention [for a short] interrogation was reasonable.
>
> ...
>
> Once the search of the premises was completed and resulted in the discovery of drugs and firearms, the agents had reasonable suspicion to focus on any occupant who was present in the home voluntarily or purposefully. Although McEaddy was already handcuffed at this point, the use of handcuffs does not necessarily turn an encounter into an arrest for which probable cause is required.... McEaddy was not removed from the home, placed in a squad car, or taken to the police station.... Rather, the agents took McEaddy into the adjoining dining room, where he was briefly questioned. Although the intrusion was significant, it was reasonable in light of the significant law enforcement interests and the physical surroundings of the encounter.

*Fountain,* 2 F.3d at 664, 666.

Although the concerns that arise when the police are serving an arrest warrant in a residence are somewhat different from the concerns that arise when the police are searching a residence for evidence of a crime, courts have applied the *Summers* rule to cases involving arrest warrants too.[7] For instance, in *People v. Hannah,* 51 Cal. App.4th 1335, 59 Cal.Rptr.2d 806 (1996), the police entered an apartment to serve an arrest warrant on a juvenile offender. The officers ordered the occupants to remain seated while they served the warrant. Based on the officers' contact with one of the occupants, they concluded that he was under the influence of drugs, and they arrested him. The California Court of Appeal concluded that the police acted lawfully when they temporarily detained the defendant:

> [I]t is reasonable for a police officer who is in a residence attempting to execute an arrest warrant to determine who is present. This is true even when he does not reasonably believe [that] any one of [these occupants] is the subject of the arrest warrant. If the police officer has received information [that] the suspect he is attempting to arrest is in the residence, it is reasonable to conclude [that one or more of the] people inside may know the suspect and have information concerning where he might be found. Additionally, a reasonable police officer could be concerned [that] the individuals in the residence not only know the suspect, but are either related to or friends with him. Therefore, it is reasonable to conclude [that these] individuals may attempt to alert the suspect to the fact the police are there or might assist him in escaping. Consequently, there was a legitimate governmental interest in detaining defendant to determine who he was and if he had any information concerning the juvenile they were searching for, while the other officers searched the apartment. In addition, the detention was reasonably

---

**6.** *See id.* at 666.

**7.** *See United States v. Vaughan,* 718 F.2d 332, 334–35 (9th Cir.1983); *State v. Spraggin,* 71 Wis.2d 604, 239 N.W.2d 297, 304–05 (1976).

necessary to ensure defendant did not warn the juvenile or assist him in evading arrest.

*Hannah,* 59 Cal.Rptr.2d at 811–12.

However, the decision in *Hannah* must be contrasted with the decision reached by the Illinois Court of Appeals in *People v. Bailey,* 314 Ill.App.3d 1059, 248 Ill.Dec. 216, 733 N.E.2d 891 (2000). The *Bailey* court recognized that the *Summers* rule applies to the execution of an arrest warrant, but the court concluded that the police exceeded their authority when they not only detained an occupant of the residence while they conducted their search, but then also questioned and searched him after their search of the residence was completed.[8]

The Illinois court reasoned that the decision in *Summers* was an application of *Terry v. Ohio*[9] to a specific circumstance (the execution of a warrant). The court then noted that, under *Terry,* even when the police are justified in temporarily detaining a person, the scope of that detention is limited by the officers' justification for the detention:

> In *Terry v. Ohio,* the United States Supreme Court explained that the reasonableness of such a detention is determined by ascertaining (1) "whether the officer's action was justified at its inception," and (2) "whether [the officer's action] was reasonably related in scope to the circumstances which justified the interference in the first place." ... The *Terry* standard applies to a detention occurring within a residence after police officers have legitimately entered the residence.

*Bailey,* 248 Ill.Dec. 216, 733 N.E.2d at 894 (internal citations omitted).

The Illinois court then concluded that the police exceeded their authority under *Terry*—and, therefore, their authority under *Summers*—when they questioned and searched Bailey:

> Were [Officers] Jensen and Ambrosini allowed to question [Bailey] about his own criminality, and then search his pocket for illegal items, when their justification for

detaining him was to prevent interference with Keese's arrest?

. . .

> In the instant case, the justification given by Jensen and Ambrosini for detaining [Bailey] was to prevent him from interfering with Keese's arrest. They operated within the bounds of that justification when they stood in front of [Bailey] and prevented him from leaving the kitchen. The record shows that no further action was needed to accomplish [the officers'] purpose. Nevertheless, the officers expanded the scope of [Bailey's] detention by questioning him about his own criminality and searching him for illegal items. This conduct was unrelated to Keese's arrest and did not facilitate their original goal of merely preventing interference with execution of the warrant. We thus [uphold the lower court's] finding that [Bailey's] fourth amendment rights were violated.

*Bailey,* 248 Ill.Dec. 216, 733 N.E.2d at 894–95.

Both the decision in *Hannah* and the decision in *Bailey* uphold the authority of the police to restrain the occupants of a residence, to the extent reasonably necessary, when the police enter the residence pursuant to a warrant authorizing them to search for a fugitive. The extent of reasonable restraint is somewhat different in an arrest warrant context than it would be in a normal search warrant context because the rationale for the restraint is different.

When the police are serving a normal search warrant—that is, when a magistrate has determined that there is probable cause to believe that evidence of a crime will be found inside the residence—the police will often have reason to believe that the occupants of the residence have some connection to the illegal activity being investigated. In such circumstances, not only will the police be authorized to restrain the occupants to prevent them from interfering with the search, but even when the search is ended, the police will often have sufficient reasonable suspicion to briefly continue their deten-

---

8. *Bailey,* 248 Ill.Dec. 216, 733 N.E.2d at 894–95.

9. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

tion of the occupants for investigative purposes under Alaska's version of the *Terry* rule—the *Coleman–Ebona* rule.[10]

█ But when the police are serving a warrant whose sole purpose is to allow the officers to enter a residence to make an arrest, a third person's mere presence at the residence will often furnish no reasonable ground for believing that this third person is connected to the fugitive's crimes. In such circumstances, while the officers may have the authority to restrain the occupants of the residence to a reasonable degree to prevent their interference with the arrest, the officers will generally have no basis for continuing their detention of these occupants after the arrest has been made—or, as in the present case, after the officers have searched the residence and have assured themselves that the fugitive is not there.

This explains the differing results in *Hannah* and *Bailey*. The court in *Hannah* upheld the defendant's conviction because the police obtained the incriminating evidence during the temporary restraint imposed on the defendant while the officers conducted their search for the juvenile named in the warrant. On the other hand, the court in *Bailey* reversed the defendant's convictions because the police obtained the incriminating evidence only after the officers unlawfully prolonged their detention and questioning of the defendant.

*Application of this law to the facts of Way's case*

█ In the present case, the officers' sole reason for entering the apartment was to search for a fugitive, Noriega. The officers had no information that any illegal activity was occurring in the apartment. Thus, the officers had no articulable basis for believing that Way was about to commit, or had just committed, a serious crime (other than the drug offense which had been uncovered the previous week).

Nevertheless, based on the results of the traffic stop the week before, the officers had articulable reasons to believe that Way was a drug trafficker who at least occasionally went armed. Given this knowledge, the officers were justified in taking precautions with Way to ensure their safety while they conducted the search of the apartment for Noriega. Moreover, several other people were present in the apartment when the officers arrived, and the officers needed to at least watch these people during the search. We therefore conclude that the officers were authorized to temporarily restrain Way in handcuffs while they conducted their search.

But although the officers may have been authorized to restrain Way while they conducted their search of the apartment, the officers had no suspicion of criminal activity to justify their continued detention of Way (under the *Coleman–Ebona* rule) after the search was completed.

Potentially, Way's continued detention might have been justified if the officers reasonably believed that Way had just helped Noriega escape from the apartment—an action that would have constituted hindering prosecution under AS 11.56.770. But the officers had the apartment under surveillance and surrounded for some time before they decided to enter. Thus, the officers' failure to find Noriega in the apartment meant that he had not been there for a while. Under these circumstances, the fact that Way was present at the apartment when the officers arrived did not provide a reasonable basis for the officers to infer that Way had aided Noriega to avoid apprehension.

It is true that, when the officers interviewed the owner of the apartment, she confirmed that Noriega had been there earlier in the day. It is therefore possible that other people in the apartment (including Way) had information about Noriega's movements or whereabouts. But after the officers completed their search of the apartment, they had no continuing authority to detain the occupants of the apartment to question them about these matters.

(Compare the Georgia Court of Appeals' decision in *Mercer v. State*, 251 Ga.App. 465, 554 S.E.2d 732, 734–35 (2001). In *Mercer,*

---

**10.** The Alaska rule governing investigative stops was articulated in *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976), and *Ebona v. State*, 577 P.2d 698, 700 (Alaska 1978).

ten to twelve officers executed a search warrant at a residence where a party was being held; the warrant was based on probable cause to believe that a fugitive would be at the party and that drugs would be found there as well. The officers handcuffed and searched everyone at the party; no one was free to leave until the officers "had talked to [them] and determined [that] they had nothing to do with it." [11] The Georgia court held that this wholesale detention and search of every person at the party was illegal—that the police could handcuff and search individual party-goers only if the officers reasonably suspected that that particular person posed a danger to them while they conducted their search, or that the person might aid the fugitive, or that the person was connected to the illegal drug activity.[12])

In sum, the officers in the present case had no articulable basis for continuing to restrain Way, and to subject him to custodial questioning, after the officers completed their search and discovered that Noriega was not in the apartment.

*The State's alternative argument that, even though the officers may not have had the authority to continue their restraint of Way, the officers were nevertheless authorized to frisk Way before they released him*

■ The State argues in the alternative that even if the officers improperly restrained and questioned Way after the officers completed their search for Noriega, the officers were nevertheless entitled to frisk Way before they released him—and that the syringe and the glass pipe would have been discovered in the frisk.

Way does not dispute the State's assertion that the incriminating evidence would have been discovered during a patdown of Way's outer clothing. However, Way argues that the officers had no justification for frisking him.

The State relies on the Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). The

*Ybarra* decision extended the rule of *Terry v. Ohio* (a case that dealt with investigative stops based on suspicion of criminal activity) to situations in which police officers must come into contact with people while serving a search warrant. In *Ybarra*, the Supreme Court held that the police were entitled to frisk the people they encountered at the premises being searched if the police could show that the frisk was a reasonable step to ensure the officers' safety. (The *Ybarra* decision is discussed in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 4.9(d), Vol. 2, pp. 635–36.)

But even though the *Ybarra* decision acknowledges that the police have the right to conduct protective frisks when serving a warrant, the facts of *Ybarra* illustrate a situation in which this kind of protective frisk is *not* authorized.

The defendant in *Ybarra* was a patron of a tavern who happened to be present when the police served a search warrant at the tavern. The warrant was based on probable cause to believe that the bartender was dealing heroin.[13] When the police entered the tavern, they frisked every patron. During the officers' frisk of Ybarra, they discovered six packets of heroin. The Supreme Court held that the frisk of Ybarra had been illegal:

> It is true that the police possessed a warrant ... to search the tavern in which Ybarra happened to be at the time the warrant was executed. But ... [e]ach patron who walked into the ... [t]avern ... was clothed with the constitutional protection against an unreasonable search or ... seizure.... Although the search warrant ... gave the officers authority to search the premises and to search [the bartender], it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers.
>
> ...
>
> [T]he State argues that the ... patdown search of Ybarra constituted a reasonable

**11.** *Mercer*, 554 S.E.2d at 734.

**12.** *Id.* at 734–35.

**13.** *Ybarra*, 444 U.S. at 87–88, 100 S.Ct. at 340–41.

frisk for weapons under the doctrine of *Terry v. Ohio* [citation omitted].... We are unable to [agree]. The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, [the required] predicate to a patdown of a person for weapons. *Ybarra*, 444 U.S. at 91–93, 100 S.Ct. at 342–43.

The Supreme Court noted that the police did not "recognize [Ybarra] as a person with a criminal history", nor did the police have "any particular reason to believe that he might be inclined to assault them". Ybarra's "hands were empty", he "gave no indication of possessing a weapon", and he "made no gestures [nor took] other actions indicative of an intent to commit an assault".[14] For these reasons, the court concluded, the officers had no reasonable basis to frisk him.

■ This Court, too, has affirmed the principle that the police can not frisk a person based simply on that person's "unfortunate choice of associates".[15] Rather, "the predicate to a patdown of a person for weapons is a reasonable belief that [the person] [is] armed and presently dangerous."[16] Thus, we must decide whether the officers in this case had sufficient reason to believe that Way was armed and presently dangerous— that is, whether the circumstances established "a substantial possibility that [Way]

possessed items which could be used for an attack [on the officers] and that [Way] would so use [these items]".[17]

Often, in a *Terry* context, the suspicion of criminal activity that justifies the investigative detention will also provide the reasoned basis for concluding that the person detained might be armed and presently dangerous. This is most likely to be true when the police have articulable suspicion that the person has just committed, or is about to commit, a serious felony.[18] And this is sometimes true with regard to people who are present when the police are executing a search warrant: if the search warrant is for evidence of a violent crime (or a crime that is commonly associated with violent behavior, such as drug dealing), and if the police have reason to believe that the people on the premises are associated with that crime, then the police will often have the requisite basis for a protective frisk.[19]

But when the search warrant is for evidence of a crime that does not commonly involve violence, or if the crime does involve violence but the people on the premises have no apparent connection to the crime, then the police will not be authorized to conduct protective frisks unless the officers have some additional affirmative indication that particular individuals are armed and presently dangerous.[20]

14. *Ybarra*, 444 U.S. at 93, 100 S.Ct. at 343.

15. *United States v. Bell*, 762 F.2d 495, 499 (6th Cir.1985).

16. *Eldridge v. State*, 848 P.2d 834, 838 (Alaska App.1993), quoting *United States v. Bell*, 762 F.2d at 499.

17. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 9.5(a), Vol. 4, p. 253.

18. *See* LaFave, § 4.9(d), Vol. 2, pp. 638–39, and § 9.5(a), Vol. 4, p. 254–56.

19. *See* LaFave, § 4.9(d), Vol. 2, pp. 639, 640–42.

20. *LaFave*, § 9.5(a), Vol. 4, p. 256–57. *See United States v. Ward*, 682 F.2d 876, 881 (10th Cir. 1982) (holding that the police could not frisk the occupant of a residence that was being searched for evidence of illegal bookmaking, because there was no reason to believe that the occupant was armed and presently dangerous); *United States v.*

*Clay*, 640 F.2d 157, 162 (8th Cir.1981) (holding that there was no basis for the police to frisk a person who knocked at the door of the apartment the officers were searching, when the police had no idea whether he was connected to the crime they were investigating); *United States v. Cole*, 628 F.2d 897, 899 (5th Cir.1980) (holding that the police had no basis for frisking a person who drove into the carport of the premises they were searching); *State v. Vandiver*, 257 Kan. 53, 891 P.2d 350, 357–58 (1995) (officers serving a search warrant for illicit drugs at an apartment had no basis for frisking visitors to the apartment); *State v. Grant*, 361 N.W.2d 243, 247 (N.D. 1985) (no basis for searching the purse of a woman who entered the premises carrying groceries and accompanied by two small children while the search was underway); *State v. Myers*, 55 Or.App. 370, 637 P.2d 1360, 1362 (1981) (the police had no basis to frisk a guest at an apartment where they executed a search warrant for marijuana, when the police had no reason to suspect that this guest was a buyer or co-possessor of the marijuana). *See also Leveto v. Lapina*,

Way's case falls within this latter category. The police had no indication that criminal activity was occurring at the apartment; rather, they entered because they believed that a fugitive was present in the apartment. Before conducting their search, the officers restrained Way and the other male occupants and guests, but solely because these men happened to be there at the time. There was nothing about the circumstances of this encounter that gave the officers any reason to believe that Way might be armed and presently dangerous. There was no indication that Way was presently engaged in criminal activity, and Way did not act aggressively or engage in furtive movements or give the officers any other reason to believe that he might be inclined to assault them.

The State points out that Noriega, the fugitive whom the officers were seeking, was apparently known to be armed and dangerous. But the issue is not Noriega's dangerousness; rather, the issue is Way's apparent dangerousness. Compare *United States v. Chaves*, 169 F.3d 687, 691–92 (11th Cir.1999); *Sharrar v. Felsing*, 128 F.3d 810, 824–25 (3rd Cir.1997); and *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir.1996)—all three cases holding that the police's authority to conduct a protective sweep of a building (incident to making an arrest at that building) hinges on "facts giving rise to a suspicion of danger from an attack by a third party during the arrest, not the dangerousness of the arrested individual." [21]

The State alternatively contends that the officers had an affirmative reason to believe that Way was armed and presently dangerous—a reason that was not based on the circumstances of the encounter at the apartment, but rather was based on the circumstances of the traffic stop the week before. As we explained earlier in this opinion, one of the state troopers involved in the raid on the apartment had prior knowledge of Way. One week earlier, this same trooper had participated in a traffic stop of Way's vehicle; the vehicle contained the components for a methamphetamine lab, as well as a tote bag with a loaded gun inside it. These facts, the State asserts, provided sufficient basis for the officers to conclude that Way might be armed and presently dangerous—thus authorizing the officers to frisk Way before they released him.

As *LaFave* recognizes, a frisk may be justified if the officer knows "that the suspect had previously ... engaged in serious criminal conduct [or] that the suspect had previously been armed".[22] However, as the New Jersey Supreme Court stated in *State v. Valentine*, 134 N.J. 536, 636 A.2d 505, 510–11 (1994), "a frisk never will be justified based solely on the officer's knowledge of a suspect's criminal history". There must be some aspect of the present encounter that makes the person's prior crimes pertinent to the officer's assessment of whether the person is currently armed and presently dangerous.[23]

Court decisions on this issue tend to draw a line between instances where the police reasonably suspect a person of using or buying drugs and instances where the police reasonably suspect that the person is dealing drugs on the street. Courts are generally not willing to accept the premise that all persons who use drugs are potentially armed and dangerous; but courts are more willing to accept the premise that people who deal drugs in large quantities or who deal drugs on the street may be armed.[24]

258 F.3d 156, 165–66 (3rd Cir.2001) (suggesting that law enforcement officers conducting a search for evidence of tax evasion would normally have "little reason to suspect that [persons on the premises] posed a threat").

**21.** *Chaves*, 169 F.3d at 692, quoting *Colbert*, 76 F.3d at 777.

**22.** § 9.5(a), Vol. 4, p. 258.

**23.** *See, e.g., United States v. Hairston*, 439 F.Supp. 515, 518–19 (N.D.Ill.1977), a case in which the defendant was stopped for driving a vehicle with a noisy muffler; the court held that the fact that the defendant was a convicted felon did not justify a frisk.

**24.** *Compare Upshur v. United States*, 716 A.2d 981 (D.C.App.1998), *State v. Arthur*, 149 N.J. 1, 691 A.2d 808 (1997), and *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153 (2000) (rejecting the notion that a frisk is justified whenever officers have a reasonable suspicion that the person is using or attempting to purchase illicit drugs), *with United States v. Hishaw*, 235 F.3d 565 (10th Cir.2000), *State v. James*, 795 So.2d 1146 (La. 2000), and *Abraham v. State*, 962 P.2d 647 (Okla.

The facts of Way's case fall somewhere between these poles. Way had been found in possession of the "components" of a methamphetamine lab. Notwithstanding this discovery, the police did not arrest him for a drug offense. The record does not explain why no arrest occurred. The police may have had tactical reasons for leaving Way on the street despite having probable cause to arrest him; on the other hand, the identity of the "components" found in Way's vehicle may have been ambiguous enough that police were unsure whether they had probable cause for an arrest.

The discovery of the handgun in Way's vehicle also failed to provide clear evidence of Way's dangerousness. As Trooper Johnson conceded at the evidentiary hearing, the weapon was not found on Way's person, but rather in his vehicle. There was another person in the vehicle, and Johnson conceded that the weapon might have belonged to this other occupant. Moreover, Johnson never asserted that Way had acted belligerently or aggressively toward the officers during the earlier traffic stop.

We consider it to be a close question whether Johnson's knowledge of the prior traffic stop gave the officers a sufficient basis for frisking Way before releasing him. However, we believe that it is better policy to resolve this case in favor of a frisk.

We are aware that police officers are sometimes advised to proceed under the assumption that every person they deal with may be armed. This may be prudent advice, especially in Alaska, where people are gener-

ally free to carry concealed weapons. But if the Fourth Amendment is to be enforced, an officer's lack of information as to whether a person is armed can not, standing by itself, justify a frisk. *Terry* and *Ybarra* are based on the proposition that the officer must have affirmative indications that the person both possesses a weapon (or an object that could be used as a weapon[25]) and is potentially motivated to use that weapon against the officer.

On the other hand, law enforcement officers are often required to place themselves in harm's way—in particular, to put themselves at close quarters with people who may be motivated to harm them. In deciding what circumstances justify a protective frisk, we must not set the bar so high that officers are needlessly endangered. We conclude that Way's apparent involvement with drug trafficking, and the discovery of the weapon in his vehicle in the earlier traffic stop, provided a sufficient basis to authorize the officers to perform a protective frisk of Way's outer clothing before releasing him.

*Conclusion*

For the reasons explained here, the judgement of the superior court is AFFIRMED.

---

Crim.App.1998) (upholding frisks based on reasonable suspicion that the person was selling drugs on the street).

**25.** *See State v. Wagar,* 79 P.3d 644 (Alaska 2003).